**LARRY SPIER, INC., Plaintiff-Appellant,**

v.

**BOURNE COMPANY, Defendant-Appellee.**

No. 225, Docket 91–7456.

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 1991.

Decided Jan. 9, 1992.

election on my behalf.

M. William Krasilovsky, New York City (Edward M. Cramer, Feinman & Krasilovsky, New York City, of counsel), for plaintiff-appellant.

Janet P. Kane, New York City (Theodore C. Max, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for defendant-appellee.

Frederick F. Greenman, New York City (Deutsch Klagsbrun & Blasband, New York City, of counsel), for amicus curiae The Songwriters Guild of America.

Before MINER and MAHONEY, Circuit Judges, and MISHLER, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Larry Spier, Inc. appeals from a summary judgment entered in the United States District Court for the Southern District of New York (Haight, J.) in favor of defendant-appellee Bourne Company. Both parties are music publishers, and the district court concluded that Bourne was entitled to judgment as a matter of law because the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* ("Copyright Act"), prohibits recognition of the assignment under which Spier claims ownership of certain disputed copyrights. *See Larry Spier, Inc. v. Bourne Company,* 750 F.Supp. 648, 649–51 (S.D.N.Y.1990).

This case is one of first impression. Our review of a district court's grant of summary judgment is *de novo. See Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707, 710 (2d Cir.1991). Resolution of this dispute therefore depends upon our own analysis of the text, structure and purposes of the relevant Copyright Act provisions, particularly Section 304(c). For the reasons that follow, we hold that the district court erred in granting summary judgment in favor of Bourne. Accordingly, the judgment of the district court is reversed.

## BACKGROUND

This case recalls the bygone era of Tin Pan Alley and the popular music of another day. Between 1925 and 1931, successful songwriter Dave Dreyer joined with some famous co-authors in assigning to Irving Berlin, Inc., as publisher, copyrights for

* Hon. Jacob Mishler, of the United States District Court for the Eastern District of New York, sitting by designation.

five songs still popular enough to generate royalties worth fighting over: "Cecelia," written with Herman Ruby; "Me and My Shadow," "Back in Your Own Back Yard," and "There's a Rainbow 'Round My Shoulder," written with Billy Rose and Al Jolson; and "Wabash Moon," written with Morton Downey and Billy McKenney. Irving Berlin, Inc. is the predecessor in interest of defendant-appellee Bourne Company. The initial term of each copyright was 28 years, and the five copyrights therefore were scheduled to expire between 1953 and 1959. In 1951, prior to the expiration of the initial term of the copyrights, Dreyer assigned to Bourne the right to renew the copyrights. Like the original assignment agreements, the 1951 agreements allocated the various types of royalties to be earned from the songs between Dreyer, as co-author, and Bourne, as publisher. The royalties earned from the manufacture and sale of records of the songs (known as "mechanical royalties") were split evenly between Dreyer and Bourne, as were royalties from licenses for use of the songs in broadcasts and movies. Dreyer was paid a royalty for each copy of the sheet music sold as well.

The Dreyer songs also generated royalties from public performances of the songs (known as "performance royalties"). In the music business, performance royalties are paid by the performer to performing rights societies such as the American Society of Authors, Composers and Publishers ("ASCAP"), of which the songwriter and publisher are members. Dreyer and Bourne were members of ASCAP. ASCAP's practice is to distribute half of the performance royalties to the songwriter ("writer distributions"), and the remaining half to the publisher ("publisher distributions"). See Sidney Shemel & M. William Krasilovsky, *This Business of Music* 158 (4th ed. 1979). While the songwriter and publisher may by contract alter the allocation of the performance royalties, Dreyer and Bourne did not do so. Under the assignment agreement, Bourne was entitled to retain all of the publisher distributions made by ASCAP. The agreement further provided that its terms were subject to any existing arrangements between Dreyer or

Bourne and ASCAP, apparently meaning that Dreyer was entitled to retain all writer distributions made by ASCAP. In any event, Dreyer and Bourne interpreted the agreement over the years in this manner, with writer distributions being paid to Dreyer and publisher distributions to Bourne.

It appears that Bourne duly renewed the copyrights prior to expiration. Under the copyright laws then in effect, the so-called "renewal term" of the copyrights would have continued until 1981–87. The most recent Copyright Act further extends the life of the Dreyer copyrights until 2000–2006. *See* 17 U.S.C. 304(b).

In 1965, Dreyer executed a will (the "Will") in which he purported to place the following "music assets" in a testamentary trust: (i) "copyrights," (ii) "renewal copyrights and extensions thereof," (iii) "publishing contracts with respect to musical compositions written by me," and (iv) "the rights deriving from my membership, as a writer, in [ASCAP], in accordance with its rules." The Will provided that income from the trust was to be paid to Anna (Dreyer's wife), Lewis (Dreyer's son), Marie (Dreyer's daughter) and Mynna Granat (Dreyer's mistress). A special provision of the Will permitted ASCAP to pay Dreyer's writer distributions directly to the beneficiaries of the testamentary trust rather than to the trust itself. Upon Dreyer's death in 1967, the Will was probated and the trust came into being in accordance with its terms, with ASCAP making the writer distributions directly to the trust beneficiaries.

Lewis Dreyer died in 1972 and was survived by his sons Steven and Dean, who succeeded to their father's rights under the Will. In 1981, Anna, Marie, Steven and Dean attempted to terminate the assignments that Dreyer had made to Bourne and recapture family ownership of the assigned copyrights by serving Bourne with notice of termination in accordance with Section 304(c) of the Copyright Act. In 1984, Anna died intestate, her interests in the trust passing to Marie, Steven and Dean. Steven and Dean purported to assign their

portions of the copyrights to Spier in 1988, and were to receive in return a percentage of the royalties earned. In 1989, Dean died intestate, leaving a son as his only heir. Marie purported to assign her portion (the final remaining portion) of the copyrights to Spier in 1990, on terms similar to the assignment by Steven and Dean.

The purported assignments to Spier of the Dreyer copyrights have not yet taken effect. The trust and ASCAP continue to make payments as designated in the testamentary trust: Marie (⅓ share), Steven (⅙ share), Dean's son (⅙ share) and Mynna (⅓ share). Spier initiated the present action in March 1990, alleging that the Dreyer family validly had terminated, pursuant to Section 304(c), Bourne's copyright assignments, and that Bourne had wrongfully refused to recognize the termination and relinquish the copyrights to Spier.

## DISCUSSION

■ Section 304(c) provides in pertinent part that the "grant of a transfer or license of the renewal copyright or any right under it" made by the author, his widow or his children, "otherwise than by will," may be terminated by the author, his widow or his children. *See* 17 U.S.C. § 304(c).

The thrust of Bourne's argument is that "Dreyer's widow and surviving children had no right of termination under [Section 304(c)] because Dreyer's copyrights, renewal copyrights and publishing contracts were transferred by will prior to the vesting of any termination rights. Any other conclusion would be inconsistent with Section 201(d) of the Copyright Act, which provides that copyright ownership may be transferred by will." Spier counters principally that the phrase "otherwise than by will" is not relevant here, since Dreyer assigned the copyrights for the renewal periods to Bourne by contract in 1951, prior to his death. Accordingly, Spier contends that this is a simple case about the rights of Dreyer's widow and children under Section 304(c) to terminate Dreyer's 1951 assignment.

Judge Haight found both contentions "arguable," but concluded that the text and legislative history of the Copyright Act better supported Bourne's position. Specifically, the district court determined that the statute should be construed to protect Dreyer's intent, as expressed in the Will, to provide for Mynna, and that Mynna would be "entirely cut off" by the attempted termination and recapture of the copyrights:

> I decline to adopt a construction of the Copyright Act which would thwart an author's intentions expressed in a will, particularly where Congress has made plain its legislative intention to authorize the transfer of copyright interests by bequests in wills, and, in the particular context of termination, to protect the author's bequests.

*Spier*, 750 F.Supp. at 651. Judge Haight apparently concluded, as a predicate to this determination, that the 1951 agreement assigning the renewal copyrights to Bourne fell within the term "publishing contracts" as used in Dreyer's Will; and that the agreement was a "right under" the renewal copyright for purposes of Section 304(c). *See id.*

We believe that Spier is correct about the operation of Section 304(c) in this case, and that the district court erred in its construction of the Copyright Act. The 1951 assignment agreement between Dreyer and Bourne provided that Dreyer

> hereby sells, assigns, transfers and sets over unto [Bourne] and its successors and assigns, the renewal copyrights ... and *all his right, title and interest, vested and contingent*, therein and thereto, subject to the payment of the royalties hereinafter provided for.... (emphasis added).

It is not necessary in this case to define the exact scope of the term "right under" a renewal copyright as used in Section 304(c). We hold only that, in view of the unqualified and unambiguous language of the assignment agreement, Dreyer did not have any "right under" the renewal copyrights remaining at the time he executed his Will. Literally, all of Dreyer's rights already had been transferred to Bourne in 1951, notwithstanding the language employed in

Dreyer's Will to describe the assets placed in the testamentary trust.

While the 1951 assignment agreement may have constituted a "publishing contract" as that term is used in Dreyer's Will, the agreement did not reserve to Dreyer any "right under" the renewal copyrights for purposes of Section 304(c) because it expressly granted all such rights to Bourne. Dreyer's right to receive part of the royalties from the copyrights does not negate the fact that he retained no interest in the renewal copyrights themselves. We have indicated, in other cases involving assignment agreements similar to that between Dreyer and Bourne, that a share of the royalties provides consideration for the transfer of the copyright itself, *see Rose v. Bourne, Inc.*, 176 F.Supp. 605, 608–09, 611–12 (S.D.N.Y.1959), *aff'd*, 279 F.2d 79 (2d Cir.), *cert. denied*, 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), and does not render a clear assignment of copyrights less than "absolute," *see Fain v. Irving Trust Co.*, 48 F.2d 704, 705–06, 710 (2d Cir.1931).

Thus, none of Dreyer's testamentary transfers actually involved a property right covered by Section 304(c). Rather, all rights to which Section 304(c) refers had been transferred from Dreyer to Bourne by ordinary contract in 1951 (i.e., "otherwise than by will," in the language of the statute). Therefore, the Dreyer family had the right, under the statute, to terminate the 1951 assignment and recapture the renewal copyrights for the family. Accordingly, the post-termination assignment of the renewal copyrights by members of the Dreyer family to Spier was not invalid under Section 304(c).

Furthermore, it is evident from the plain language of Section 304(c) that the purpose of the statute is to protect the property rights of widows and children in copyrights. The provision addresses little other than the rights of these persons to terminate assignments of copyrights made by the spouse and parent, and to recapture the copyrights for themselves. Those are precisely the rights that Dreyer's wife, sons and daughter asserted against Bourne. The "widow" and "children" of Dreyer pursued the course of action provided to them in Section 304(c), serving termination notices on Bourne and seeking to recapture the renewal copyrights that Dreyer assigned to Bourne by contract in 1951. Whatever effect the termination might have upon Mynna's rights under the 1967 testamentary grant is wholly incidental and secondary to the exercise of the express rights provided by the statute to those it is concerned with protecting.

Section 304(c) is not necessarily a provision for the effectuation of the author's "intent." If the author's intent were the paramount concern of the statute, then no termination of any kind would be allowed, because most authors presumably "intend" to make the assignment that is the very object of Section 304(c)'s termination provisions. Thus, there is a limit on the weight that courts should attach to the author's subjective desires, and it is in this sense that the "otherwise than by will" language should be understood. Granting supremacy to the author's intent as against the rights of the widow and children would obviate the reason that Section 304(c) is in the Copyright Act to begin with and distort the deliberate legislative choice made by Congress, unless the grant of copyright renewals was made by will in the first instance.

It is also apparent that Section 201(d)(1) is not helpful to an application of Section 304(c) in this case. Section 201(d)(1) simply says that copyrights "may" be transferred by will, as did the old 1909 Copyright Act. However, the rest of the statute allows, and indeed presupposes, that copyright interests may also be transferred in other ways. Significantly, Section 201(d)(1) itself also expressly permits transfers by ordinary conveyance or operation of law, in addition to transfers by will. *See* 17 U.S.C. § 201(d)(1). The provision is equally consistent with grants by both contract and bequest, and therefore does not inform an interpretation of Section 304(c), which also refers to grants by both contract and bequest.

The legislative history of the Copyright Act need not be considered in resolving this case, because the text and structure of the statute are sufficiently clear on the issue presented. The district court relied on some legislative history to support its conclusion that the Copyright Act protected the bequest to Mynna: " '[T]he right of termination would be confined to inter vivos transfers or licenses executed by the author, and would not apply to ... the author's own bequests.' " *See Spier*, 750 F.Supp. at 651 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 125 (1976)). However, it appears that the legislative history referred to pertains to Section 203 rather than Section 304(c).

■ Significantly, Section 203 and Section 304 are different provisions involving different rights. Section 203 deals with the power to terminate grants made "otherwise than by will" that were executed *on or after* January 1, 1978. *See* 17 U.S.C. § 203. This case involves no grants made after January 1, 1978. Because this is so, Section 304, rather than Section 203, is applicable. Section 304(b) extends the duration of copyrights under circumstances such as those prevailing here for a term of 75 years after the copyright was originally secured. Without Section 304(b), the renewal periods of the Dreyer copyrights would have expired during the 1981 to 1987 period. However, with the extension, the copyrights will continue into the 2000–2006 period.

With the new property right created by Section 304(b) comes an increased power on the part of the family to recapture that right. As is related in the history of Section 304: "The arguments for granting rights of termination are even more persuasive under section 304 than they are under section 203; the extended term represents *a completely new property right,* and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it." *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 140 (1976) (emphasis added). Read in conjunction with the language and purpose of Section 304(c)—a provision in which references to the author are always followed by the terms "widow" and "children"—this legislative history offers no support for the elevation of Mynna's interests over the termination rights of Dreyer's family. To the contrary, Section 304(c) is designed to protect a new family property right that does not exist under Section 203, and references to the history of Section 203 therefore are inappropriate here.

Analysis of the weakness in old copyright law that Section 304(c) was designed to redress further supports the conclusion that the family's termination and recapture rights must prevail in this case. As *amicus* The Songwriters Guild points out, the old 1909 Copyright Act's Section 28 attempted to protect the author's family by having the renewal rights simply revert back to the widow and children notwithstanding an assignment by the author of the copyright itself. The Register of Copyrights always understood this provision as operating

> to change the usual rules, under State laws, of succession to a deceased person's property. For example, it gives the right to obtain a renewal copyright to a deceased author's widow and children, *even if the author purports to leave his rights to others in his will.*

*See* House Comm. on Judiciary, 87th Cong., 1st Sess., Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 53 (Comm.Print 1961) (emphasis added). However, Section 28's protection was rendered inadequate by the Supreme Court in *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), in which it was held that if the author survived into the renewal period, an assignment of the renewal rights executed during the initial term of the copyright cut off this right of reversion. *See id.* at 656, 63 S.Ct. at 778.

Accordingly, in revising the copyright laws, an explicit provision to terminate the assignment (that is, Section 304(c)) was drafted so as to leave no doubt about the family's power to recapture the copyright. Indeed, Section 304(c)(5) expressly provides

that termination "may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." *See* 17 U.S.C. § 304(c)(5).

Lastly, upon consideration of the various types of royalties generated by the Dreyer copyrights, it is far from clear to us that Mynna would be "entirely cut off" from the income of the Dreyer trust if the termination were given effect. The statute's plain terms do not operate as harshly as suggested by the district court and Bourne. Public performance royalties, typically the principal source of royalties, are composed of the "publisher distributions" and "writer distributions" mentioned previously. It is true that termination would allow recapture of the publisher distributions previously paid to Bourne by ASCAP, because Bourne would no longer have any interest in the copyrights. However, Bourne never paid any portion of its publisher distributions to the Dreyer trust, so Mynna will not be "cut off" from them in any event. As to writer distributions, *amicus* The Songwriters Guild points out that ASCAP practice is to continue to pay these to the beneficiaries of a writer's testamentary trust notwithstanding termination. Since the Dreyer Will clearly states that Dreyer's ASCAP writer distributions are to be paid in accordance with ASCAP's rules, Mynna should continue to share in these royalties as before.

Mechanical royalties derive from licenses granted both before and after termination. The Supreme Court has held that a will beneficiary such as Mynna cannot be cut off from royalties generated by licenses granted prior to termination, meaning that the Dreyer family and Spier will recapture only prospective revenue from licenses granted post-termination. *See Mills Music, Inc. v. Snyder,* 469 U.S. 153, 167–69, 105 S.Ct. 638, 646–48, 83 L.Ed.2d 556 (1985). The same reasoning presumably would be applicable to the remaining types of royalties for use of the songs. Moreover, according to *amicus* The Songwriters Guild, pre-termination licenses typically constitute the second largest source of royalty income for the years immediately following termination.

## CONCLUSION

The judgment of the district court is reversed and the case is remanded for further proceedings.