**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE RAY CHARLES FOUNDATION, a California Corporation, *Plaintiff-Appellant*, v. RAENEE ROBINSON, an individual; RAY CHARLES ROBINSON, JR., an individual; SHEILA ROBINSON, an individual; DAVID ROBINSON, an individual; ROBERT F. ROBINSON, an individual; REATHA BUTLER, an individual; and ROBYN MOFFETT, an individual, *Defendants-Appellees*. | No. 13-55421 D.C. No. 2:12-cv-02725-ABC-FFM OPINION |

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
February 12, 2015—Pasadena, California

Filed July 31, 2015

Before: David Bryan Sentelle,[*] Morgan Christen,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Christen

**SUMMARY**[**]

**Copyright**

Reversing the district court's dismissal for lack of jurisdiction, the panel held that the Ray Charles Foundation, the sole beneficiary of Ray Charles's estate, had standing to challenge the validity and effectiveness of notices of termination of copyright grants conferred by Charles to the predecessor of Warner/Chappell Music.

The panel held that the Foundation had Article III standing and that the suit was ripe. The panel held that the Foundation did not have standing to challenge the termination notices as a beneficial owner. Nonetheless, the Foundation was a real party in interest because the termination notices affected its right to royalties, and its claims fell within the statutory zone of interests. Accordingly, it had standing to sue to challenge whether the underlying works were works made for hire and thus not subject to the termination

---

[*] The Honorable David Bryan Sentelle, Senior Circuit Judge for the U.S. Court of Appeals for the District of Columbia Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

provisions of 17 U.S.C. §§ 203 and 304(c).  The panel remanded the case for further proceedings.

## COUNSEL

Mark Daniel Passin (argued), Yakub Hazzard, and Daniel G. Stone, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, California, for Plaintiff-Appellant.

Marc Toberoff (argued), Toberoff & Associates, P.C., Malibu, California, for Defendants-Appellees.

## OPINION

CHRISTEN, Circuit Judge:

When music legend Ray Charles died, he left behind remarkable legacies in music and philanthropy. This appeal arises from the intersection of the two. Seven of Charles's heirs purported to terminate copyright grants that Charles conferred while he was alive. The Ray Charles Foundation, the sole beneficiary of Charles's estate, filed suit to challenge the terminations. The district court dismissed the suit for lack of jurisdiction, and the Foundation now appeals. We reverse the district court's order and remand for further proceedings.

## BACKGROUND[1]

### I.  Charles's Copyright Interests

In the 1950s, Ray Charles Robinson, young and early into his career, entered into several contracts with music publisher Atlantic Records and its subsidiary, Progressive Music Publishing Co. The contracts indicated that Charles was an employee of the publishers, who owned all copyright interests in Charles's work. Under the contracts, Charles was entitled to advance payments and future royalties.

By 1980, Charles had achieved considerable success and renown. That year, he renegotiated his copyright grants with

---

[1] Because the Foundation appeals the district court's decision on a motion to dismiss, we "accept all allegations of fact in the complaint as true and construe them in the light most favorable to the plaintiff[]." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Progressive's successor in interest. The renegotiation pertained to songs Charles had previously conveyed to Progressive, as well as published and unpublished works that he had not yet assigned to any publisher. The 1980 grant entitled Charles to royalties and another advance payment.

Charles founded a nonprofit corporation now known as The Ray Charles Foundation. The Foundation was established for "scientific, educational[,] and charitable purposes." It provides research and scholarship grants for the benefit of deaf, blind, and underprivileged youths.

At the time of his death, Charles had twelve adult children, seven of whom are involved in this case as Defendants-Appellees.[2] In 2002, Charles informed all of his heirs that he would establish irrevocable trusts of $500,000 for each of them if they agreed to waive further claims to his estate. Each of the heirs, including all of the Terminating Heirs, signed a contract providing:

> My father, Ray Charles Robinson, has told me that he will set up an irrevocable trust for my benefit, to be funded with $500,000. This gift is my entire inheritance from him and I understand that I will not inherit anything further under my father's estate plan and that I am waiving any right to make a claim against his estate.

---

[2] We use the term "Terminating Heirs" to refer to the seven Defendants-Appellees who served the termination notices. We use "Charles's heirs" to refer to all twelve of the artist's adult children, including those not involved in this suit.

Charles passed away in 2004.  According to the complaint, Charles's will named the Foundation as his sole beneficiary and devised "all of [Charles's] rights in his works and rights under contracts, including the compositions that are the subject of this action, to The Foundation."  The Foundation is precluded from accepting private donations.  It relies on royalties from Charles's works to fulfill "the wishes of Ray Charles and [t]he Foundation's purpose."

## II.  Relevant Statutory Provisions

Sections 203 and 304 of the Copyright Act of 1976 govern termination of copyright grants.  17 U.S.C. §§ 203, 304(c), 304(d).  The provisions were designed to "safeguard[] authors against unremunerative transfers . . . needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited."  H.R. Rep. No. 94-1476, at 124 (1976); *see also* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 11.07[E][4][b] (Matthew Bender, rev. ed. 2014) (observing that the provisions were intended to protect "authors and their spouses, children, and grandchildren against unremunerative transfers and improve their bargaining position").

Section 203 pertains to grants and transfers made after 1978: "In the case of any work *other than a work made for hire*,[3] the . . . grant of . . . any right under a copyright,

---

[3] A work made for hire is:

> (1) a work prepared by an employee within the scope of his or her employment; or

executed by the author . . . , otherwise than by will, is subject to termination under [specified] conditions." 17 U.S.C. § 203(a) (emphasis added). Under this statute, termination of a copyright grant may be effected at any time during a five-year period, starting 35 years after the execution of the grant. *Id.* § 203(a)(3). Because the 35-year period began with grants made in 1978, opportunities to execute termination notices under § 203 started to accrue "for the first time on January 1, 2013." U.S. Copyright Office, Analysis of Gap Grants under the Termination Provisions of Title 17 at 8 (Dec. 7, 2010), *available at* http://www.copyright.gov/reports/gap-grant-analysis.pdf.

Subsection 304(c) covers grants made before 1978:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, *other than a copyright in a work made for hire*, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this

---

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

> section, otherwise than by will, is subject to
> termination under [specified] conditions.

17 U.S.C. § 304(c) (emphasis added). The subsection is "a close but not exact counterpart of section 203." *See* H.R. Rep. No. 94-1476, at 140. Under § 304(c), terminations may be effected during a five-year period starting 56 years from the date the copyright was secured, or January 1, 1978, whichever is later. 17 U.S.C. § 304(c)(3). Most existing case law on copyright termination pertains to § 304(c) because opportunities to terminate copyright grants became ripe under this statute earlier than grants subject to § 203.[4]

The Copyright Office's regulations provide:

> A copy of the notice of termination shall be
> recorded in the Copyright Office before the
> effective date of termination, as a condition to
> its taking effect. However, the fact that the
> Office has recorded the notice does not mean
> that it is otherwise sufficient under the law.
> Recordation of a notice of termination by the
> Copyright Office is without prejudice to any
> party claiming that the legal and formal
> requirements for issuing a valid notice have
> not been met, including before a court of
> competent jurisdiction.

---

[4] There are some other distinctions between the termination rights conferred under § 203 and § 304(c), but they are not relevant to this appeal. *See* H.R. Rep. No. 94-1476 at 140–42 (discussing differences). A third termination provision not relevant to this case exists in 17 U.S.C. § 304(d).

37 C.F.R. § 201.10(f)(6). Effective termination causes "all rights . . . that were covered by the terminated grants [to] revert to the author, authors, and other persons owning termination interests [as provided in previous clauses]." 17 U.S.C. § 203(b). A deceased "author's surviving children . . . own the author's entire termination interest unless there is a widow or widower . . . ." *Id.* § 203(a)(2)(B); *see also id.* § 304(c)(2)(B).

Both § 203 and § 304(c) are silent on who may challenge the validity of termination notices.

## III. The Subject Termination Notices

In March 2010, the Terminating Heirs filed 39 notices under § 203 and § 304(c) to terminate pre- and post-1978 grants authorized by Charles. They served the notices on various parties, including Warner/Chappell Music, Progressive's successor in interest. The notices served on Warner/Chappell pertain to the 51 compositions at issue in this case. Those works include some of Charles's greatest hits, such as "I Got A Woman," "A Fool for You," "Blackjack," "Leave My Woman Alone," and "Hallelujah, I Love Her So." The notices have staggered effective dates, ranging from April 1, 2012 through September 28, 2019. Each notice specifies a date on which it purports to terminate all rights tied to the copyright grants, at which point those rights will revert in proportionate shares to each of Charles's heirs. *See* 17 U.S.C. §§ 203(b), 304(c)(6). The Terminating Heirs issued multiple termination notices for some of the compositions, thereby purporting to subject individual works to multiple termination dates. For example, three termination notices were issued for the song "Mary Ann," each asserting

a different termination date: April 1, 2012,  November 15, 2015, and May 3, 2019.

The Copyright Office recorded the termination notices in January 2012.  *See* U.S. Copyright Office, Public Catalog, Recorded Document Nos. V3603D883 (§ 203 notices), V3603D884–898, V3603D904–905, V3603D909–910, V3603D914, V3603D916–917, V3603D919, V3603D924, V3604D349 (§ 304 notices); *see also Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record.").

## IV.      District Court Proceedings

In March 2012, the Foundation brought suit to challenge the termination notices.  Its complaint asserts state law claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and a federal claim for declaratory and injunctive relief.  The district court granted the Terminating Heirs' motion to dismiss the state law claims under California's anti-SLAPP statute, and the Foundation does not appeal that ruling.

The federal claim is the only one at issue in this appeal. In it, the Foundation requests "a judicial determination of the validity and effectiveness of the termination notices and its rights and obligations."  It also seeks a declaratory judgment establishing:

> (1) the compositions at issue are excluded from the termination provisions because they were works made for hire; (2) if the compositions were not works made for hire, then the 1980 agreement constituted a

renegotiation of the transfer of most of the songs, satisfying the statutory right of termination; (3) the notices pertaining to unpublished works are invalid because the right of publication of those songs were not exercised within five years of the 1980 agreement; (4) the 1980 agreement constituted a new transfer and all termination deadlines should be calculated from that date; and (5) the Court should determine which of the multiple termination notices for each composition is operative, if any.[5]

Further, the Foundation seeks to enjoin the Terminating Heirs from claiming that they are, or will become, the rightful owners of the copyright interests; entering any agreement that would transfer those interests; and using the compositions in ways not permitted by parties who do not own copyright interests.

The Terminating Heirs moved to dismiss. They argued that the Foundation lacked standing to bring its federal claim because it was really asserting the rights of Warner/Chappell, Progressive's successor in interest and the current copyright owner. The Terminating Heirs relied in part on the inalienable nature of termination rights, which cannot be waived through contract. *See* 17 U.S.C. §§ 203(a); 304(c)(5)–(6)(B). They highlighted the fact that Congress enacted the current statutory termination provisions when it

---

[5] The complaint also seeks a declaration that the Terminating Heirs breached their contracts with Charles. Because the district court dismissed the state law contract claim, it also dismissed the request for that declaration. The Foundation does not appeal these decisions.

extended copyright renewal terms because it intended to benefit authors and their statutory heirs, not grantees. *See* H.R. Rep. No. 94-1476 at 140. In opposition, the Foundation asserted that it alleges injury to itself, and that there is no authority supporting the Terminating Heirs' position that copyright ownership is a prerequisite for challenging a termination notice.

During oral argument on the motion to dismiss, the Foundation alternatively argued that even if the 51 works were not created as works made for hire, the Foundation is a beneficial owner[6] with standing to sue for copyright infringement and that it should therefore have standing to challenge the termination notices. The Terminating Heirs argued that the concept of beneficial ownership is not relevant here because beneficial ownership pertains only to copyright infringement. After oral argument, the district court ordered supplemental briefing on two issues:

> (1) Assuming that the works at issue were not works made for hire and the Foundation is a "beneficial owner" of the copyrights, does the Foundation have standing under the Copyright Act to challenge the termination notices under §§ 304(c) and 203(a) as a "grantee" of an "exclusive or nonexclusive grant of a transfer or license" of any right under the copyrights?

---

[6] Beneficial owners include, "for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003) (quoting H.R. Rep. No. 94-1476, at 159).

(2) Given the allegations in the current complaint, can the Foundation allege facts to support a claim that the works were not works made for hire consistent with Rule 11?

After the parties filed their supplemental briefs, the district court issued an order granting the motion to dismiss, concluding that the Foundation lacked standing to bring this action. The court first observed that the Terminating Heirs did not challenge the Foundation's constitutional standing and "the Foundation has at least plausibly alleged that it exists here." The court then moved to what it termed "prudential standing." Applying the zone-of-interests test, the court concluded that the Foundation's asserted interests were not among those protected by § 203 and § 304(c). The court reasoned: "Those sections do not define who may challenge termination notices, although, by their terms, they only contemplate that certain parties will be involved in the termination process." The court noted that the sections do not mention parties that acquire by bequest the right to receive future royalty streams. The district court concluded that this "indicate[s] that only authors, statutory heirs owning a termination interest, and grantees of transfers and their successors fall within the 'zone of interests' Congress contemplated in enacting these provisions."

Thus, the court reasoned that the Foundation could only claim third-party standing because it was "only asserting Warner/Chappell's interests in the termination notices," not its own. The district court did not address the Foundation's interest in the continued receipt of royalties. Because the Foundation did not show that it had a close relationship with Warner/Chappell, or that Warner/Chappell was incapable of protecting its own interests, the court concluded that the

Foundation did not have third-party standing to challenge the termination notices. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) ("We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an injury in fact thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." (citations and internal quotation marks omitted)).

In response to the Foundation's alternative theory that it has standing as a beneficial owner of the copyright interests, the district court concluded that because the Foundation's complaint alleged that the compositions were created as works for hire, it was not a beneficial owner and thus did not have standing to challenge the termination notices.[7]  The court denied leave to amend, pretermitting whether the Foundation could amend its complaint to allege that the compositions were *not* works made for hire because in either event, the Foundation's interests did not fall within the termination provisions' zone of interests, and the Foundation lacked third-party standing to assert the interests of Warner/Chappell.

The Foundation timely appealed.  We have jurisdiction under 28 U.S.C. § 1291, and we reverse the district court's decision.

---

[7] A creator of a work made for hire does not qualify as a beneficial owner even if he or she is entitled to royalties. *See Warren*, 328 F.3d at 1144–45.

## STANDARD OF REVIEW

"We review de novo a district court's order dismissing a complaint for lack of jurisdiction under Rule 12(b)(1)." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). At this stage, the Foundation "need only show that the facts alleged, if proved, would confer standing upon" it. *Id.* at 1140.

## ANALYSIS

There is no challenge to the Foundation's Article III standing. The "irreducible constitutional minimum of standing" requires that (1) the Foundation suffer a concrete, particularized, and actual injury in fact; (2) there be "a causal connection between the injury and the conduct complained of"; and (3) a favorable decision will likely redress that injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Foundation's complaint satisfies these requirements: it establishes that the Foundation relies on royalties from the copyright grants; the Terminating Heirs' notices sought to terminate those grants; the terminations, if valid, would deprive the Foundation of its income stream; and a declaration of the terminations' invalidity would redress that deprivation.

Although neither party argued ripeness, "it is our duty to consider *sua sponte* whether [a suit] is ripe, because 'the question of ripeness goes to our subject matter jurisdiction to hear the case.'" *Haw. Newspaper Agency v. Bronster*, 103 F.3d 742, 745 (9th Cir. 1996) (alteration omitted) (quoting *Shelter Creek Dev. Corp. v. City of Oxnard*, 838 F.2d 375, 377 (9th Cir. 1988)); *see also Ctr. for*

*Biological Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) ("[R]ipeness . . . is not waivable.").

The Foundation's suit is ripe. The Foundation's claims pertain to termination notices for grants governing 51 different works, executed in different contracts, at different times. Termination notices do not automatically terminate grants; the effective dates of termination depend on the date of each grant and the validity of the notices. *See* 17 U.S.C. §§ 203(a)(3), 304(c). The Terminating Heirs issued the termination notices in March 2010, the Copyright Office recorded the notices in January 2012, and the earliest asserted termination date passed on April 1, 2012. That asserted date pertained to at least seven of Charles's works, including "I Got A Woman," one of Charles's most famous songs. The Foundation filed its complaint on March 28, 2012, and the district court granted the Terminating Heirs' motion to dismiss on January 25, 2013. The asserted termination dates for 12 of the 51 works had passed by the time of the district court's order, and the dates for a total of 23 works have elapsed as of the issuance of this opinion.

The Foundation alleges that the notices of termination immediately clouded its ability to assess its future income stream and to rely on the royalties. Its complaint presents questions regarding the nature of the underlying works, such as whether they were works made for hire, and if so, when their respective termination dates would be effective. Review of these questions does not require us to engage in abstract inquiries about speculative injuries. *See Wolfson v. Brammer*, 616 F.3d 1045, 1057 (9th Cir. 2010) ("The ripeness doctrine is peculiarly a question of timing, designed to separate matters that are premature for review because the injury is speculative and may never occur from those cases that are

appropriate for federal court action. Through avoidance of premature adjudication, the ripeness doctrine prevents courts from becoming entangled in abstract disagreements." (alteration, citations, and internal quotation marks omitted)); *see also id.* at 1058 (identifying the question of ripeness as "whether the issues presented are 'definite and concrete, not hypothetical or abstract'" (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc))). We accept as true the Foundation's allegation that the effects of the termination notices "have been felt in a concrete way" because the notices have "created an enormous cloud over the future copyright ownership" of the 51 works and made it "very difficult, if not impossible, to exploit the valuable copyrighted assets." The Foundation's complaint is therefore not premature. It would be an inefficient use of judicial resources to compel the Foundation to file a different suit after each termination date has passed.

We recognize that, as in cases in which suits were found unripe for adjudication, the record contains no determination by the Copyright Office of the validity of the termination notices. *See Smith v. Casey*, 741 F.3d 1236, 1244–45 (11th Cir. 2014). But the parties made clear in the district court that "there [i]s nothing pending before the Copyright Office" because the Office does not typically hold proceedings to adjudicate the validity of termination notices. The Copyright Office has expressly stated "it does not issue or enforce notices of termination," but "only serves as an office of public record for such documents." *Compendium of Copyright Office Practices III* § 2305 (2014). "The fact that a document has been recorded is not a determination by the U.S. Copyright Office concerning the validity or the effect of that document. *That determination can only be made by a court of law*." *Id.* (emphasis added). And "the fact that the

[Copyright] Office has recorded the notice does not mean that it is otherwise sufficient under the law"; recordation "is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction."  37 C.F.R. § 201.10(f)(6).

Satisfied that this suit meets the threshold requirements of constitutional standing and ripeness, we proceed to the only remaining issue: whether the Foundation may sue to challenge the termination notices.

## I.

The Foundation argues that it has standing to challenge the termination notices as a beneficial owner.  It bases this argument on its status as the sole beneficiary of Charles's will.[8]  The Foundation reasons that because the Copyright Act accords standing to beneficial owners in the context of infringement, beneficial owners have standing in the context of termination.  We disagree.  The term "beneficial owner" comes from 17 U.S.C. § 501, which is titled "Infringement of copyright."   Subsection 501(b) provides that a beneficial owner is entitled "to institute an action for any infringement."  *See also Silvers v. Sony Pictures Entm't*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (reasoning that only a legal or beneficial owner may sue for infringement).  The district

---

[8] If some or all of the works were not made for hire, then Charles was likely a beneficial owner of those works because he would have been "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003) (quoting H.R. Rep. No. 94-1476, at 159) (internal quotation marks omitted).

court relied in part on the concept of beneficial ownership when it granted the motion to dismiss, but the Foundation's claims are about termination of copyright grants, not copyright infringement.  The argument that the Foundation may be a beneficial owner lends no support to its claim to standing.

## II.

The Terminating Heirs argue that the Foundation must satisfy the requirements for third-party standing because the complaint actually asserts the interests of Warner/Chappell. The Foundation argues that it is a "real party in interest and [that it is] not asserting rights of a third party."  We agree with the Foundation.

Historically, courts have treated the limitation on third-party standing as a prudential principle that requires plaintiffs to assert their own legal rights.  *See* Erwin Chemerinsky, Federal Jurisdiction § 2.3.4 (6th ed. 2012).  "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, th[e Supreme] Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[9]  *Warth v. Seldin*, 422 U.S. 490,

---

[9] *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), removed the zone-of-interests inquiry from the prudential standing doctrine, but *Lexmark* did not pertain to third-party standing.  *Id.* at 1387 n.3 ("This case does not present any issue of third-party standing, and consideration of that doctrine's proper place in the standing firmament can await another day.").  We conclude, in unison with all other courts to have spoken on the issue, that the third-party-standing doctrine continues to remain in the realm of prudential standing.  *See, e.g.*, *HomeAway Inc. v. City & Cnty. of S.F.*, No. 14-cv-04859-JCS, 2015 WL 367121, at *7

499 (1975).  This rule ensures that "plaintiffs possess such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional [or statutory] questions."  *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1057 (9th Cir. 2004) (internal quotation marks omitted).

It is undisputed that copyright ownership lies with Warner/Chappell, but just as the termination notices affect Warner/Chappell's ownership of copyrights, they also directly affect the Foundation's right to royalties.  *See* 17 U.S.C. §§ 203(b), 304(c)(6); *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 780 (2d Cir. 1992).  The Foundation is the sole recipient of royalties flowing from Charles's copyright grants and effective termination would deprive it of the right to receive prospective royalties.  *See Larry Spier*, 953 F.2d at 780.  We thus have little difficulty concluding that the Foundation is litigating its own stake in this controversy.

This conclusion is buttressed by comparing the Foundation's interests to Warner/Chappell's.  The publisher's interests will be prejudiced only if Charles's heirs are

_____

(N.D. Cal. Jan. 27, 2015) (unpublished) (declining to extend "*Lexmark* to invalidate a prudential standing doctrine that it explicitly did not reach," and observing that the holding "is consistent with a number of other courts that have interpreted *Lexmark* as leaving the prudential doctrine of third-party standing unaffected"); *Chandler & Newville v. Quality Loan Serv. Corp. of Wash.*, No. 03:13-cv-02014-ST, 2014 WL 2526564, at *4 (D. Or. Jun. 3, 2014) (unpublished) ("Because *Lexmark* did 'not present any issue of third-party standing,' the Court did not decide the 'doctrine's proper place in the standing firmament,' leaving it as part of the prudential standing inquiry.").

successful in their efforts to terminate the existing grants and then either agree to grant copyright ownership to another publisher, or renegotiate grants with Warner/Chappell on terms less favorable to the publisher than the terms of the existing grants. Otherwise, it makes no difference to Warner/Chappell whether it continues to pay royalties to the Foundation under the current grants, or to Charles's heirs under new grants. In their brief on appeal, the Terminating Heirs recognize that if they decide to renegotiate grants with Warner/Chappell, the publisher's interests will be largely unaffected: "A terminated grantee may well be more interested in maintaining an amicable relationship with the terminating author or statutory heir to facilitate re-licensing." Indeed, the statutory termination provisions reflect Warner/Chappell's interest in remaining friendly to the Terminating Heirs, by giving negotiating priority to terminated grantees:

> A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between [a majority of the statutory heirs] and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of subsection (a).

17 U.S.C. § 203(b)(4). Because Warner/Chappell's interests are not necessarily at risk, it has diminished reason to litigate, particularly because challenging the Terminating Heirs might endanger its interests.

In this case, the party presenting the most concrete adverseness to the Terminating Heirs is the Foundation. The Foundation "plainly asserts its own legal rights and interests, not those of another, thus making immaterial any question about the jurisdictional character of 'third-party standing.'" *See Lifestyle Enter., Inc. v. United States*, 751 F.3d 1371, 1376 (Fed. Cir. 2014) (citations omitted).

## III.

We now turn to the zone-of-interests test, which looks to the statutory provisions at issue and asks whether Congress authorized the plaintiff to sue under them. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–90 (2014). The crux of the Foundation's complaint is that § 203 and § 304(c) do not apply to the underlying works because they are works made for hire. *See* 17 U.S.C. §§ 203(a) ("In the case of any work *other than a work made for hire* . . . ." (emphasis added)), 304(c) ("In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, *other than a copyright in a work made for hire* . . . ." (emphasis added)). The Terminating Heirs argue that the Foundation's suit does not fall in the termination statutes' zone of interests because the termination statutes were intended to benefit authors' surviving spouses and heirs. But this ignores the central premise of the Foundation's suit, which is that the termination provisions do not apply at all. As the holder of legal rights and interests that will be truncated if the termination notices are valid, the Foundation has standing to challenge whether the underlying works are subject to the termination provisions. If the compositions are works made for hire, the termination statutes do not apply. *See* 17 U.S.C. §§ 203(a), 304(c). Further, as we explain below, even if we assume that the compositions are not works

made for hire and that the underlying grants are subject to termination, we would conclude that the Foundation's suit falls under the statutory provisions' zone of interests.

The Supreme Court first articulated the zone-of-interests test in *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150 (1970). There, the court stated that standing "concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153. The Court later explained:

> [T]he test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987) (footnote omitted).

In the past, the Supreme Court has characterized the test as one pertaining to "prudential standing." *See, e.g.*, *Fed. Election Comm'n v. Atkins*, 524 U.S. 11, 20 (1998); *Bennett*, 520 U.S. at 163; *cf.* Erwin Chemerinsky, Federal Jurisdiction § 2.3.6 (6th ed. 2012). But in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Supreme Court rejected the idea that the test bears on prudential standing or jurisdiction:

> Although we admittedly have placed that test under the "prudential" rubric in the past, it does not belong there . . . . Whether a plaintiff comes within "the 'zone of interests'" is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim. As Judge Silberman of the D.C. Circuit recently observed, "'prudential standing' is a misnomer" as applied to the zone-of-interests analysis, which asks whether "this particular class of persons has a right to sue under this substantive statute."

*Id.* at 1387 (alteration and citations omitted). The Court recast the zone-of-interests inquiry as one of statutory interpretation, holding that the question is whether a plaintiff "has a cause of action under the statute." *Id.* It further explained that the "standing" label was misleading because "'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case.'" *Id.* at 1387, 1388 & n.4 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002)); *see also Pit River Tribe v. Bureau of Land Mgmt.*, —F.3d—, 2015 WL 4393982, at *8 (9th Cir. 2015) ("[T]he [*Lexmark*] [C]ourt . . . made clear that whether a plaintiff's claims are within a statute's zone of interests is not a jurisdictional question.").

Notably, the Court suggested that a heightened standard for the zone-of-interests test might apply in non-APA cases:

> We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes.

*Lexmark*, 134 S. Ct. at 1389 (quoting *Bennett*, 520 U.S. at 163) (internal quotation marks omitted).  The Court did not articulate exactly how the zone-of-interests inquiry differs for non-APA actions like this one, but the above passage does suggest that the relevant question for such actions is whether there exists "a valid (as opposed to arguable) cause of action."  *See id.* at 1387–89 & n.4.  This question bears on whether a claim may be maintained by the party asserting it, not the court's jurisdiction to consider the claim.  *See id.* at 1387.

*Lexmark* looked to the Lanham Act's "'unusual, and extraordinarily helpful[]' detailed statement of the statute's purposes."  *Id.* at 1389.  The Court observed "the Act's goal of protecting persons engaged in commerce within the control of Congress against unfair competition," and of redressing "injuries to business reputation and present and future sales."  *Id.* at 1389–90 (alterations and internal quotation marks omitted).  It thus held that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."  *Id*. at 1390.

The Supreme Court also articulated a second requirement to bring suit for false advertising under § 1125(a) of the

Lanham Act.  It termed this the proximate cause requirement, and explained that it "is controlled by the nature of the statutory cause of action," and centers on the question "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Id.*; *see also id.* at 1394 ("'Where the injury alleged is so integral an aspect of the violation alleged, there can be no question' that proximate cause is satisfied." (alteration omitted) (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982))).   In the context of the Lanham Act's prohibition on false advertising and unfair competition, the Court held "that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.* at 1391.   Applying the zone-of-interests test, the Court held that the plaintiff in *Lexmark* fell "within the class of plaintiffs whom Congress authorized to sue under § 1125(a)" because the plaintiff alleged injuries "to precisely the sorts of commercial interests the Act protects," and because it "adequately alleged proximate causation."  *Id.* at 1393–94.

The Copyright Act does not expressly provide for a private right of action under § 203 and § 304(c), but we conclude that an implied private cause of action exists under the termination provisions.  The Supreme Court has indicated that an implied right of action requires that "the statute manifest[] an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).  A private right and remedy are contemplated by the termination provisions; the statutes plainly accord authors and statutory heirs the ability to terminate prior grants and

recapture copyright ownership for works that were not made for hire. *See* 17 U.S.C. §§ 203, 304(c). In contrast to schemes that can only be enforced by a government agency, the termination provisions can be enforced by private action. *See* 37 C.F.R. § 201.10(f)(6) ("Recordation . . . is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction.").[10] Other courts have entertained suits challenging termination validity under these statutory provisions. *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) (terminated grantee's challenge of statutory heirs' § 304(c) termination notices); *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008) (challenge to statutory heirs' termination notice asserted by grantee's assignee); *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) (suit filed by author's grandchild and prime beneficiary of trust that received royalties from underlying grant, seeking declaration that termination notice was valid); *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774 (2d Cir. 1992) (suit between two publishers: one an assignee of the author's right to renew, the other an assignee of the author's heirs' copyright interests, after a termination attempt); *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859 (S.D.N.Y. 1987) (suit between two publishers: the original grantee and a post-termination grantee who received rights through agreement with the beneficiary of the author's widow's estate).

---

[10] The Foundation argues that the Copyright Office's use of "any party" instead of "grantee" constitutes an agency interpretation that "any party" may challenge termination notices. We are not persuaded. This provision indicates only that recordation of a termination notice does not bar challenges to the validity of termination notices. It says nothing about who may bring suit.

Because we conclude that there are legislatively conferred causes of action under these termination statutes, the next question is whether the statutory causes of action encompass the Foundation's claims. *See Lexmark*, 134 S. Ct. at 1387. We begin with the statutory purposes of the termination provisions, which were intended "to 'safeguard authors against unremunerative transfers' and improve the 'bargaining position of the authors' by giving them a second chance to negotiate more advantageous grants in their works after the works had been sufficiently 'exploited' to determine their 'value.'" *Milne*, 430 F.3d at 1046 (alteration omitted) (quoting H.R. Rep. No. 94-1476, at 124). The improved bargaining position and "more advantageous grants" generally provide to authors a greater share of the royalties, which other courts have recognized as "the most valuable part of the termination rights." *See MPL Commc'ns, Inc.*, 675 F. Supp. at 863.

The Foundation's claim centers on its right to continue receiving royalties. If it is determined that some or all of the works are subject to the termination provisions because they were not made for hire, the Foundation's ability to maintain this action to challenge the notices depends upon whether Congress intended to allow a party receiving royalties under a contractual assignment or will to challenge the validity of termination notices.

The Terminating Heirs argue that the interests asserted by the Foundation in this case are not an ideal match for the legislative intent of these provisions because the purpose of § 203 and § 304(c) was to enhance authors' bargaining power and protect their ability to exploit their works. *See* H.R. Rep. No. 94-1476, at 124; *Milne*, 430 F.3d at 1046; *MPL Commc'ns, Inc.*, 675 F. Supp. at 863. Because the

Foundation is neither the grantee nor Charles's statutory heir, the Terminating Heirs are correct that the Foundation is not a party expressly mentioned in the termination statutes. But whether the Foundation's interests are explicitly identified in the statute is not dispositive. Instead, the central question is whether the Foundation alleges injuries "*to precisely the sorts of . . . interests the Act protects*." *Lexmark*, 134 S. Ct. at 1393–94 (emphasis added). Because the Terminating Heirs issued "multiple notices of termination pertaining to the same compositions, not all of which can possibly be valid," the Foundation alleges that the notices make "it very difficult, if not impossible, to exploit the valuable copyright assets at issue." Thus, the Foundation alleges injury to its interest in continuing to receive the royalty stream generated by Charles's works, which is the same interest that the Terminating Heirs seek to redirect to themselves. This interest is the one Congress contemplated, regulated, and protected in enacting the termination provisions. *See* H.R. Rep. No. 94-1476, at 124; *Milne*, 430 F.3d at 1046; *MPL Commc'ns, Inc.*, 675 F. Supp. at 863. We therefore conclude that the Foundation does "come[] within the zone of interests" of § 203 and § 304(c). *See Lexmark*, 134 S. Ct. at 1387 (internal quotation marks omitted).

Even if we concluded that Congress did not authorize a party in the Foundation's position to challenge the validity of termination notices, the Foundation's complaint also seeks a judicial determination establishing when the terminations come into effect for each of the 51 different works. This determination is particularly important because the Terminating Heirs issued duplicate notices with inconsistent termination dates. As the Foundation argued in the district court, "even if the Court were to determine that th[e] terminations are valid and effective, the Foundation would,

nonetheless, need a Declaration as to the timing so that it would know when, [or] if at all, its rights to continue to receive the writer share of the income might cease to exist." We agree. The Foundation is at least entitled to a declaration establishing when the right to receive royalties reverts to Charles's heirs.

It is unclear whether the Supreme Court intended the proximate cause test to be part of the zone-of-interests inquiry. *Compare Lexmark*, 134 S. Ct. at 1388–90, *with id.* at 1390–91 (assessing "Zone of Interests" and "Proximate Cause" in separate sections). But *Lexmark* did indicate that the Court "generally presume[s] that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute"; "Congress . . . is familiar with the common-law rule" of proximate cause "and does not mean to displace it *sub silentio*"; and "federal causes of action in a variety of contexts [are construed] to incorporate a requirement of proximate causation." *Id.* at 1390.

Proximate cause "bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id.* (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268–69 (1992)). There is no remoteness here. Termination, if effective, would directly extinguish the Foundation's right to receive prospective royalties from the current grants. Far from barring the Foundation's suit, the proximate cause test suggests that the Foundation is indeed a party "whose injuries [may have been] proximately caused by violations of the statute." *See id*.

## CONCLUSION

The Foundation properly asserts its own claims, which fall within the statutory zone of interests. We therefore reverse the district court's judgment and remand for further proceedings.

**REVERSED AND REMANDED.**