[No. A099722. First Dist., Div. Two. July 30, 2003.]

WILLIAM J. HARNEDY, Plaintiff and Respondent, v.
MARY B. HARNEDY WHITTY, Defendant and Appellant.

1334

**COUNSEL**

Law Offices of Robert J. Riordan and Michael S. Klein for Defendant and Appellant.

Law Offices of Cullen & Wood and John J. Cullen for Plaintiff and Respondent.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

This is an appeal from a judgment, entered after a two-day court trial, by which the trial court rescinded and cancelled a purported quitclaim deed to certain property and declared that property to be owned by a trust created by the deceased original settlor. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This litigation involves a dispute between a brother and sister regarding the ownership of the property of their deceased parents, property originally put into a trust by those parents but then, after the death of the mother, quitclaimed to the daughter by a very sick father a few weeks before his death. The son is plaintiff and respondent William J. Harnedy, hereafter respondent. The daughter is defendant and appellant Mary Harnedy Whitty, hereafter appellant. At all times relevant hereto, they had two siblings, Michael Harnedy and Noreen Harnedy. The parents of all four were Mary and William Harnedy of Dublin, Alameda County. They died in, respectively, October 1999 and January 2000.

In October 1991, the parents created a revocable inter vivos trust called the Harnedy Family Living Trust; it held all their assets, including their home in Dublin. The transfer of the home into the trust was effected by a recorded quitclaim deed. The trust provided that the parents would be the original trustees of the trust and appellant and her brother Michael cosuccessor trustees. The trust document and other testamentary documents, including durable powers of attorney, were kept in a blue binder maintained by the parents.

For a number of years prior to 1999, the father suffered from hydrocephalus and increased dementia. In 1996, he was formally diagnosed as suffering from hydrocephalus and, in January 1997, underwent an operation to insert a brain shunt.

By the summer of 1999, the father's condition had deteriorated to the point where he could no longer live at home. He had, among other things, become violent and abusive to his wife and to appellant who, along with her two children, also lived in the Dublin home. In the same summer, the mother, Mary Harnedy, was hospitalized for severe heart problems. During a visit to

**1336**

her at the hospital, the father became so loud and abusive to her that he had to be removed from the hospital.

In September 1999, appellant had her father placed in Oak Creek Alzheimer's and Dementia Care facility. From then until his death the following January, appellant had effective control over him, the care facility in which he was placed, and his finances.

After the hospitalization of the mother, appellant took possession of the blue binder containing the trust documents and powers of attorney. Shortly after the mother's death in October 1999, and even before her funeral, appellant made arrangements via an attorney to have her brother, Michael Harnedy, sign a resignation from the office of cotrustee (or cosuccessor trustee—the record is unclear on this subject). But, according to the testimony of both parties and Michael, this resignation never took effect. In any event, appellant was able, apparently with the concurrence of Michael, to gain control of two of her parents' savings accounts totaling $70,000. With those funds she opened a new account under the name the "William Harnedy Trust, Mary B. Whitty, successor Trustee." She never told respondent about any of this.

In the fall of 1999, and contrary to the sentiments of respondent who wanted his father to remain at Oak Creek, appellant moved him to a facility known as Eden Villa. This move was undertaken by appellant primarily due to cost considerations. The father reacted violently to this move, attacked a nurse at Eden Villa, and after only one day was sent to Highland Hospital on a commitment under section 5150 of the Welfare and Institutions Code.

During the entire year of 1999, the father's condition continued to deteriorate. He could not carry on a conversation with his sons, had trouble recognizing them, and would drool and mumble and look at them blankly. On November 30, 1999, the father was admitted to Kaiser Hospital in Walnut Creek in critical condition. He was unable to breath on his own and an endotracheal tube was inserted. The father stayed at Kaiser for only 10 days, and was then moved to the Parkview Hospital in Hayward.

During the same month, appellant discussed her father's condition with a friend in the real estate business and thereafter bought a blank quitclaim deed form from a stationery store. From the blue binder she now controlled, she obtained the property description of the Dublin real property and attached a copy of that description to the quitclaim deed form. On December 10, 1999, appellant brought the quitclaim deed to Kaiser Hospital and also arranged for a notary public to be present. By that point, the father was too ill and weak to sign his name. Additionally, although for some time he had needed magnifying glasses to read, he did not have those glasses on at the time he executed

the deed. Nevertheless, the father placed an "X" on the document next to his name; appellant placed her initials next to the "X" and the notary notarized the signature. The deed removed title to the Dublin home from the trust and put it in appellant's name only. According to appellant's testimony at trial, she did this because her father had told her numerous times that he wanted her to have the family home.

An expert medical witness testified that, as of December 10, 1999, the father suffered from significant defects in his thought processes as demonstrated by repeated hallucinations and delusions and, as a consequence, was unable to understand and appreciate the consequences of his actions on that date.

On December 11, 1999, the father was discharged from Kaiser to a facility at Rossmoor for physical therapy. His discharge notice stated that he was suffering, among other things, from dementia, hydrocephalus, pneumonia and anemia. As noted earlier, he died in January 2000. Not until after his death did appellant reveal that she held a quitclaim deed for the Dublin property. Appellant recorded the deed herself on February 17, 2000.

Appellant and her two children have lived at the Dublin home since before her father's death. She has never paid any rent, provided any accounting to her siblings, nor distributed any of the trust corpus. Indeed, at the time of trial she testified that she had spent approximately $40,000 of the trust corpus.

On December 8, 2000, respondent filed a four-cause-of-action complaint in Alameda County Superior Court against appellant and his other siblings. His causes of action alleged fraud, constructive fraud, financial abuse under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code §§ 15610.30 and 15657; hereafter Elder Abuse Act), and for cancellation of the deed. His prayer for relief asked for damages, punitive damages, attorney fees, and cancellation of the quitclaim deed. A lis pendens was filed the same day. Appellant answered the following month; no appearances were made for the other siblings, and they were not parties in the court below nor are they here.

As far as the record before us reveals, no pretrial motions were filed or heard. Trial to the court consumed two days, June 17 and 18, 2002, after which the matter was submitted.

On July 3, 2002, the trial court issued its Tentative Statement of Decision ruling generally in favor of respondent and ordering cancellation of the quitclaim deed. Judgment consistent with the Tentative Statement of Decision was filed on July 24, 2002, and a timely notice of appeal filed by appellant five days later.

## III. DISCUSSION

### A. *Appellant's Arguments*

Appellant argues in her opening brief that because respondent was "suing solely as a beneficiary of the trust" he "was not a *real party in interest*, and lacked *standing to bring this action*, with the result that the court *lacked subject matter jurisdiction*." In support of this double-barreled proposition, appellant relies almost entirely on one case, *Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419 [8 Cal.Rptr.2d 869] (*Saks*).

Before getting into what *Saks* did and did not hold and whether its holdings are correct and applicable, we need to separate the two propositions which appellant conflates into one. The first is that respondent, as a beneficiary of the trust, lacked standing to bring the action against her as his original complaint made clear that he was suing appellant in her individual capacity "as neither the caption nor the body of the complaint alleges appellant was sued in her capacity as trustee of the inter vivos trust."

Appellant's second argument is that the case should have been brought and heard in the probate department of the Alameda County Superior Court, and that the regular superior court lacked subject matter jurisdiction to hear and decide the case.

Other than the fact that appellant cites *Saks* in support of both arguments, the two issues (standing to sue and subject matter jurisdiction of the court) are totally unrelated in the law. We will, thus, deal with them separately.

### B. *Standing to Sue*

Appellant's argument that her brother William, the plaintiff and respondent, lacked standing to sue her is wrong for two reasons: (1) she waived the argument by not raising it in the trial court and (2) respondent did have standing notwithstanding the holding of *Saks*.

Although the record before us does not include any pretrial or posttrial pleadings of either party (other than the complaint and answer), it is clear that appellant never raised the issue of respondent's alleged lack of standing in the trial court. Appellant's answer consisted of not much more than a denial of the allegations of her brother's complaint; no affirmative defenses were pled. And in her counsel's closing argument to the trial court (he made no opening argument), the only mention of respondent's standing was a very brief one regarding his alleged lack of standing to sue for "a hundred percent" of the damages allegedly due under the Elder Abuse Act cause of action. Appellant

has thus waived any argument before us that, as a beneficiary of the trust, respondent lacked standing to sue to rescind the quitclaim deed. (See, e.g., *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316–1317 [88 Cal.Rptr.2d 758], and authorities cited therein.)

Additionally, the argument is simply incorrect. *Saks*, the case upon which appellant relies for her lack of standing argument, involved litigation brought by two beneficiaries of a testamentary trust against an attorney and real estate broker employed by the Sumitomo Bank, which was serving as a trustee of the trust. The complaint alleged negligence, breach of contract and breach of fiduciary duty on the part of the defendants, all of which allegedly resulted in a substantial diminution of the trust assets. Our colleagues in Division Three of this district affirmed the trial court's sustaining of a demurrer to the plaintiffs' amended complaint without leave to amend on the basis that, under both the Probate Code and the common law, the only real party in interest regarding claims for enforcement of the provisions of an express trust is the trustee itself (or himself or herself) and not a beneficiary. (*Saks, supra*, 7 Cal.App.4th at pp. 426–430.)

To the same effect as *Saks* is *Pillsbury v. Karmgard* (1994) 22 Cal.App.4th 743 [27 Cal.Rptr.2d 491] (*Pillsbury*). In that case, the trustee of an express trust, Wells Fargo Bank, concluded not to bring a malicious prosecution action against a prospective buyer of some of the trust's property who had sued the bank for specific performance, causing the trust to both lose and expend significant amounts of money. The beneficiary of the trust disagreed with this decision and, himself, sued both the prospective buyer and several of his collaborating real estate brokers, only to be nonsuited by the trial court for lack of standing. The appellate court affirmed, relying heavily on the ruling in *Saks*. (*Id.* at pp. 753–756.)

But both *Saks* and cases decided before and after it recognize that, when the litigation involves claims of misfeasance on the part of the trustee and third parties, the beneficiaries do indeed have standing to sue. Thus, in *Saks*, the court noted: "[W]here a trustee cannot or will not enforce a valid cause of action that the trustee ought to bring against a third person, a trust beneficiary may seek judicial compulsion against the trustee. In order to prevent loss of or prejudice to a claim, the beneficiary may bring an action in equity joining the third person and the trustee." (*Saks, supra*, 7 Cal.App.4th at pp. 427–428.)

Authorities decided both before and after *Saks* make this point even clearer. Thus, in *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093 [3 Cal.Rptr.2d 236] (*Pierce*), a beneficiary and successor trustee, joined by the guardian ad litem for minor and unborn beneficiaries, sued both the former trustees of a testamentary trust along with several investment advisors and attorneys who

worked with those former trustees. The complaint generally alleged mismanagement and poor investment advice, to the substantial detriment of the corpus of the trust. The trial court had sustained the demurrers of the two sets of attorneys without leave to amend and then dismissed the complaint as to them.

The Court of Appeal reversed, holding that, both under common law and the California Probate Code, a claim could be asserted against the attorneys. In so holding, the court said: "The issue is, then, whether a cause of action may be stated against respondent attorneys for assisting their clients, the former trustees, in breaches of the former trustees' fiduciary duties. The violation by the former trustees of any duty that they owed appellants as beneficiaries of the Trust is a breach of trust. [Citation. ] Those duties include the duty of loyalty (Prob. Code, § 16002); the duty to deal impartially with the beneficiaries (Prob. Code, § 16003); the duty to avoid conflicts of interest (Prob. Code, § 16004); the duty to control and preserve trust property (Prob. Code, § 16006; Rest.2d Trusts, §§ 175, 176); the duty to make trust property productive (Rest.2d Trusts, § 181); the duty to dispose of improper investments (Rest.2d Trusts, §§ 230, 231); and the duty to report and account (Prob. Code, § 16060). The standard of care with respect to trust investments is the modern 'prudent investor' rule. [Citation.] [¶] The beneficiaries of a trust may sue a trustee to recover profits or recoup losses resulting from a trustee's breach of any of the foregoing duties. [Citation.] At common law, the beneficiaries of a trust could also sue third persons who participated with a trustee in alleged breaches of trust .... [¶] Here, the allegations of the second amended complaint plainly state a cause of action for participation in a breach of trust. The complaint alleges that the former trustees, on the advice of defendant Schwartz and his company, undertook a program of investment which was imprudent and unsuitable for the Trust." (*Pierce, supra,* 1 Cal.App.4th at pp. 1102–1103, 1105.)

In *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445 [80 Cal.Rptr.2d 329] (*Atascadero*), Division Four of this district reversed the trial court's judgment entered after it sustained a demurrer without leave to amend in an action brought by various cities against a securities and financial broker which had persuaded the trustee, Orange County, to pursue various ultimately disastrous investments. In seeking to affirm the trial court's judgment, the broker argued that, under *Saks,* only the trustee and not beneficiaries such as the plaintiff-cities had standing to sue it. Division Four rejected that argument, stating: "Respondents overlook the important exceptions to the general rule on which they rely. Thus, it is well established that where a trustee has committed a breach of trust, the trust beneficiaries may prosecute an action against third persons who, for their own financial gain or advantage, induced the trustee to commit the breach of trust; actively participated with, aided or abetted the trustee in

that breach; or received and retained trust property from the trustee in knowing breach of trust. [Citations.] … [¶] The rights of trust beneficiaries vis-a-vis third parties who participate in a breach of trust ultimately derive from the obligations of the trustee himself. The violation by a trustee of any duty owed to the beneficiaries of the trust constitutes a breach of trust. [Citation.] Such duties include the duty of loyalty, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, the duty to dispose of improper investments, and the duty to report and account. [Citations.] The standard of care with respect to trust investments is the 'prudent investor' rule. [Citations.] The beneficiaries of a trust may sue a trustee to recover profits or recoup losses resulting from a trustee's breach of any of these duties." (*Atascadero, supra,* 68 Cal.App.4th at pp. 462–463.)

The year after *Atascadero* was published, a panel of a division of the Second District filed a similar opinion. In *Wolf v. Mitchell, Silberberg & Knupp* (1999) 76 Cal.App.4th 1030 [90 Cal.Rptr.2d 792] (*Wolf*), one of two beneficiaries of a testamentary trust established by his deceased mother sued two sets of attorneys that had done work for the trust when he discovered that very little assets remained in it after the death of his father, the original trustee, because of large amounts paid to settle gambling and other debts of his brother and cobeneficiary. The trial court granted summary judgment for the defendant attorneys on the basis that the only real party in interest who could enforce the terms of the trust was the trustee and that the plaintiff could not, under *Saks* and *Pillsbury,* sue *qua* cobeneficiary.[1]

The *Wolf* court had no difficulty in reversing this judgment based on the holdings of *Atascadero* and *Pierce.* It stated: "In *Atascadero* the beneficiaries alleged that Merrill Lynch made direct misrepresentations to the beneficiaries, actively participated with the trustee in breaches of trust, and acted for their own financial gain. [Citation.] In *Pierce v. Lyman* the complaint alleged that the attorneys who represented the trustees actively concealed breaches of trust, made misrepresentations to the court, and acted to advance their own personal gain in the form of fees and investment opportunities. [Citation.] The allegations of the complaint in this case are similar, and Robert has standing as a trust beneficiary to bring this action for the attorneys' alleged active participation in the trustee's breaches of trust." (*Wolf, supra,* 76 Cal.App.4th at pp. 1040.)

The several holdings just discussed can, we believe, be rationalized relatively easily: when the claim being asserted rests in whole or in part on

---

[1] It also held that he could not sue *qua* cotrustee because, under the Probate Code, such an action had to be brought by both trustees and he had not joined his brother, now a cotrustee, as a plaintiff. (*Wolf, supra,* 76 Cal.App.4th at pp. 1033–1036.)

alleged breaches of trust by the trustee, a beneficiary has standing to pursue such a claim against either (1) the trustee directly, (2) the trustee *and* third parties participating in or benefiting from his, her or its breach of trust, or (3) such third parties alone. *Only* in circumstances such as those present in *Saks* and *Pillsbury*, where no misfeasance or breach of trust by the trustee is asserted and the beneficiary is effectively seeking to step into the shoes of the trustee and enforce the trust agreement directly, does the beneficiary lack standing.[2]

■ Thus, for two separate and distinct reasons, the respondent in this case, as one of the beneficiaries of his parents' trust, had standing to sue: (1) his complaint does not cite, relate to, or seek to enforce the trust agreement, but merely seeks to undo a transaction effected in violation of duties owed by appellant to her father, duties created by her confidential and fiduciary relationship with him; (2) *even if* the complaint could be construed as seeking to enforce some aspect of the trust instrument, it was brought against a current trustee[3] for what was effectively an alleged breach of trust.

## C. *Subject Matter Jurisdiction of the Trial Court*

Again citing *Saks*, appellant contends the trial court lacked subject matter jurisdiction and that such jurisdiction reposed only in the Probate Department of the Alameda County Superior Court. Again, this argument is presented here for the first time, as the issue of the trial court's jurisdiction was never raised below.

Appellant misunderstands the concept of subject matter jurisdiction, a concept this court has rather clearly defined in two recent cases, *Law Offices*

---

[2] Because the principle set forth in *Saks* and *Pillsbury* is limited to these types of cases, i.e., cases in which the beneficiary or beneficiaries are effectively trying to substitute themselves for the trustee and enforce the terms of the trust instrument themselves, we question whether, as the *Atascadero* court said, that and similar cases really involve "exceptions to the general rule." (*Atascadero, supra,* 68 Cal.App.4th at p. 462.) It seems to us that the narrower rule of *Saks* and *Pillsbury* is more like an exception to the broader principle that, once a breach of trust by the trustee is alleged, a beneficiary has standing to pursue a claim.

[3] It is unclear whether appellant was a cotrustee of the trust as of December 10, 1999, when the quitclaim deed was signed. As noted in the text, sometime before that date appellant arranged to have her brother, Michael, named along with appellant as a successor cotrustee and sign a resignation from that position. But the testimony of three of the siblings suggests rather strongly that this resignation never took effect. The trial court's statement of decision is unclear as to whether, as of December 10, 1999, the father was the only trustee or whether either appellant or Michael had then succeeded their deceased mother as a cotrustee. Further, the copy of the trust agreement introduced into evidence is missing the section dealing with successor trustees. In any event, as of the death of her father in January 2000 and the recording of the quitclaim deed the following month, appellant was apparently one of two cotrustees of the trust, the other being her brother Michael.

*of Stanley J. Bell v. Shine, Browne & Diamond* (1995) 36 Cal.App.4th 1011, 1021–1022 (*Bell*), and *Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1087–1088 (*O'Connor*).

In *Bell*, we affirmed a decision of the San Francisco Superior Court sustaining a demurrer to an attorney's declaratory relief action in that court for fees he had allegedly incurred in prosecuting a minor's personal injury action in the Nevada County Superior Court. In the course of our decision, we had occasion to consider whether the latter court had exceeded its jurisdiction in ruling as it did on a dispute between two sets of attorneys regarding attorney fees and liens for the validity of purported liens for the same. Holding that it did, we noted that the type of jurisdictional defect inherent in the Nevada County court's action was not subject matter jurisdiction because that county's court was "clearly competent to rule on an attorney fee dispute of the sort involved here." (*Bell, supra,* 36 Cal.App.4th at pp. 1021–1022.) We went on to hold that all that was involved was an act by that court "in excess of jurisdiction," which could be obviated if the party claiming a lack of jurisdiction was estopped to assert that defense (which we held he was there). (*Id.* at p. 1022.)

In support of the distinction between lack of subject matter jurisdiction and actions in excess of jurisdiction, we cited the leading Supreme Court case on the subject, *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280 [109 P.2d 942] (*Abelleira*). There, in an opinion authored by Chief Justice Gibson, our Supreme Court defined subject matter jurisdiction thusly: "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties. [Citation.] Familiar to all lawyers are such examples as these: A state court has no jurisdiction to determine title to land located outside its territorial borders, for the subject matter is entirely beyond its authority or power. [Citation.] A court has no jurisdiction to adjudicate upon the marital status of persons when neither is domiciled within the state. [Citations.] A court has no jurisdiction to render a personal judgment against one not personally served with process within its territorial borders, under the rule of *Pennoyer v. Neff,* 95 U.S. 714 [24 L.Ed. 565]. [Citation.] A court has no jurisdiction to hear or determine a case where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision. [Citation.] Other examples of lack of jurisdiction in this fundamental sense will readily occur." (*Abelleira, supra,* 17 Cal.2d at p. 288.)

The year after *Bell* was published, we decided *O'Connor,* which also dealt with the definition of subject matter jurisdiction. There, we were called upon to decide whether the San Francisco Superior Court was correct in exonerating a surety of liability for damage caused to a conservatorship estate when

that order was based in part on the ground that certain probate court orders were void for lack of jurisdiction. On appeal before us, the respondent bonding company urged us to affirm, contending that an order of the probate court was outside of its subject matter jurisdiction. (*O'Connor, supra,* 48 Cal.App.4th at p. 1087.) We disagreed, stating: "Both the trial court and Old Republic mischaracterize the jurisdictional problem at issue in this case; both fail to distinguish between conduct by a court that has no jurisdiction over the subject matter on the one hand and action which is in excess of the court's jurisdiction on the other hand … [¶] The principle of 'subject matter jurisdiction' relates to the inherent authority of the court involved to deal with the case or matter before it. (See *Abelleira* [, *supra,*] 17 Cal.2d 280, 288 [109 P.2d 942].) "In contrast, a court acts in excess of jurisdiction ' "where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." ' [Citations.]" (*O'Connor, supra,* 48 Cal.App.4th at pp. 1087–1088.)

Clearly, the Alameda County Superior Court department that heard this case did not lack jurisdiction in any fundamental sense; it was clearly "competent" and had "inherent authority" to hear the case, and there were no territorial or other bars to its jurisdiction. Appellant's contention to the contrary rests almost entirely on several passages in *Saks* in which that court used "subject matter jurisdiction" to describe what it said the Probate Department of the San Francisco Superior Court had and other departments of that court lacked regarding the dispute in that case.

With all due respect to the *Saks* court, such a characterization is simply incorrect. In the first place, and as the *Saks* court noted in footnote 7 of its opinion, there are many counties in this state, indeed probably the majority, that lack a formal probate department. If a superior court department in Del Norte County enters an order in a probate proceeding, it clearly has "subject matter jurisdiction" to do so. That and that alone should suffice to make it clear that we are not talking about any sort of "fundamental" jurisdiction as defined in the passage quoted above from *Abelleira*.

 But, even before *Abelleira*, our Supreme Court made clear that, even in a county having a formal probate department, a nonprobate department *does not* lack fundamental jurisdiction over a probate matter. Instead, and as that court held in *Dowdall v. Superior Court* (1920) 183 Cal. 348, 353 [191 P. 685] (*Dowdall*), the probate department has "primary" jurisdiction and a nonprobate department "secondary" jurisdiction of probate-related proceedings. (See also, to the same general effect: *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 87–88 [61 Cal.Rptr.2d 134, 931 P.2d 312];

*Estate of Knox* (1942) 52 Cal.App.2d 338, 344–346 [126 P.2d 108]; *Estate of McLennan* (1938) 29 Cal.App.2d 666, 668 [85 P.2d 499]; *McCaughna v. Bilhorn* (1935) 10 Cal.App.2d 674, 682–684 [52 P.2d 1025]; *Schuster v. Superior Court* (1929) 98 Cal.App. 619, 624 [277 P. 509].)

Probate Code sections 17000 and 17001 did not change this state of affairs. Those statutes were enacted (in original form in 1986) to make clear that the probate departments of the California superior courts could exercise the full and complete jurisdiction of a regular superior court when hearing and deciding a probate matter. (See, generally, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, §§ 229–230, pp. 1074–1077.) It is true that Probate Code section 17000, subdivision (a), gives the probate department of the relevant superior court "exclusive jurisdiction of proceedings concerning the internal affairs of trusts." (Prob. Code, § 17000, subd. (a).) But, for two separate and distinct reasons, that provision does not support appellant's subject matter jurisdiction argument.[4]

First of all, and for the reasons made clear in *Abelleira*, the sort of jurisdiction provided by this section is not the sort of fundamental jurisdiction, i.e., implicating the competency or inherent authority of the court, the lack of which would render a judgment void.[5] As a consequence, by not raising any issue relating to the trial court's jurisdiction below and by, instead, participating fully in the pretrial and trial of this case, appellant is barred by principles of waiver (see, e.g., *Brown v. Boren, supra,* 74 Cal.App.4th at pp. 1316–1317) and estoppel (see *Bell, supra,* 36 Cal.App.4th at pp. 1022–1025 and *O'Connor, supra,* 48 Cal.App.4th at pp. 1092–1096) from raising any such issue here.

Second, the allegations of the complaint do not relate to the internal affairs of the trust as that term is used in Probate Code, section 17000, subdivision (a). That term has been defined thusly: "Internal trust affairs, for example, include modification of the terms of the trust, changes in a designated successor trustee, other deviation from trust provisions, authority over the trustee's acts, or the administration of the trust's financial arrangements." (*Estate of Mullins* (1988) 206 Cal.App.3d 924, 931 [255 Cal.Rptr. 430].) As appellant concedes in her briefs to this court, nothing resembling any of these issues was raised by respondent's complaint.

---

[4] Although, in fact, appellant never cites these sections in her briefs to us.

[5] It is true that both the West and Deering editions of the Probate Code caption section 17000 as referring to "Subject Matter Jurisdiction." But, at least in the strict sense of "fundamental jurisdiction" discussed in *Abelleira*, this is simply incorrect. In the first place, both the 1986 and 1990 versions of the statute used the much simpler, and less pregnant, chapter title "Jurisdiction and Venue." (See Stats. 1986, ch. 820, p. 2785 and Stats. 1990, ch. 79, p. 965.) Secondly, the headings provided by the publishers of the California codes are not controlling in the slightest. (See *People v. Avanessian* (1999) 76 Cal.App.4th 635, 641–642 [90 Cal.Rptr.2d 367], and fn. 6.)

For all of these reasons, appellant's argument that the trial court lacked subject matter jurisdiction fails.

## IV. DISPOSITION

The judgment is affirmed.

Kline, P. J., and Lambden, J., concurred.

On August 21, 2003, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 29, 2003.