RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TAMMY LIVINGSTON, individually and as beneficiary
and Co-Trustee of the Livingston Music Interest Trust
and as beneficiary of the Tammy Livingston Music
Interest Trust,

*Plaintiff-Appellant*,

        No. 24-5263

    *v.*

JAY LIVINGSTON MUSIC, INC., a Tennessee
corporation; TRAVILYN LIVINGSTON, in her individual
capacity,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00532—Waverly D. Crenshaw, Jr., District Judge.

Argued: December 12, 2024

Decided and Filed: July 7, 2025

Before: SILER, CLAY, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Jonathan M. Wolf, JONATHAN M. WOLF, PLLC, Nashville, Tennessee, for
Appellant. Tim Warnock, LOEB & LOEB LLP, Nashville, Tennessee, for Appellee.
**ON BRIEF:** Jonathan M. Wolf, JONATHAN M. WOLF, PLLC, Nashville, Tennessee, for
Appellant. Tim Warnock, Keane Barger, LOEB & LOEB LLP, Nashville, Tennessee, for
Appellee.

    READLER, J., delivered the opinion of the court in which SILER and CLAY, JJ.,
concurred. READLER, J. (pp. 13–16), also delivered a separate concurring opinion.

———————————

**OPINION**

———————————

CHAD A. READLER, Circuit Judge.   In all its many forms, music is a powerful influence.  One of music's great gifts is its knack for soothing the mind.  Think of the way listening to your favorite song takes you to a place where, at least temporarily, life's frustrations are quickly set aside.  Music's perhaps most endearing quality is its ability to unite.  Whether it be a song, an artist, or an ensemble, each has its own way of joining those of different backgrounds in a shared passion.  *See generally* Raymond MacDonald, *The Social Functions of Music*, *in* Routledge International Handbook of Music Psychology in Education and Community 5–21 (Andrea Creech, Donald A. Hodges & Susan Hallam eds., 2021).  In the words of one enduring performer, "music seems to be the common denomination that brings us all together. Music cuts through all boundaries and goes right to the soul."  *Id.* at 5 (quoting Willie Nelson).

Today's case, however, offers at least one example of how music has the power to divide—even a family:  a copyright suit in which heirs to a music composer's fortune squabble over copyright assignments and associated royalties.  Travilyn and Tammy Livingston (mother and daughter) each claim a right to royalties tied to certain songs authored by Jay Livingston (Travilyn's father and Tammy's grandfather).  Between 1984 and 2000, Jay assigned his copyright interests in several songs to a music publishing company.  *See* 17 U.S.C. § 201(d).  In recent years, Travilyn invoked her statutory right to "terminat[e]" those copyright grants.  *Id.* § 203(a).  To do so, she filed termination notices with the United States Copyright Office, seeking to undo her father's assignments to the company and recapture his interests in the copyrights for herself.  Travilyn's daughter Tammy, a beneficiary of her grandfather's assignments, sued her mother, challenging the terminations.  The district court dismissed Tammy's complaint, holding that it failed to state a claim.  We affirm.

I.

Starting in the early 1940s, Jay Livingston (and his co-writer Ray Evans) churned out super-hits: "Que Sera, Sera," "Mona Lisa," "I'll Always Love You," and "Silver Bells." And they were performed by many stars, including Doris Day, Nat King Cole, Dean Martin, and Bob Hope. To say the many songs Jay and Evans composed were a success understates matters. Their productions appeared in several classic films (including Alfred Hitchcock's *The Man Who Knew Too Much*) and earned a slew of Academy Awards. They also generated more than $400 million in sales. For their enduring contributions to the music world, Jay and Evans are remembered as the "last great of the great songwriters of Hollywood." *Jay Livingston: Top Film and TV Composer Won Three Oscars*, Songwriters Hall of Fame, https://perma.cc/P7EL-JZ2U (last visited June 5, 2025).

As described next, Jay's rights to those compositions are governed by a series of transactions involving Jay, an affiliated company, and his family. And their ownership is at the heart of this litigation.

*The July 1984 Agreement.* On July 15, 1984, Jay, in keeping with federal copyright law, promised to transfer his copyright interests in several of his songs to a music publishing company, Jay Livingston Music, owned by his daughter, Travilyn. *See* 17 U.S.C. § 201(d) (explaining that the "ownership of a copyright may be transferred in whole or in part"). How would Jay assign those interests to Jay Livingston Music? "With respect to each musical composition assigned to Jay Livingston Music by Jay Livingston," the July 15, 1984 Agreement explained, "the parties shall enter into a separate popular songwriters agreement." R. 39-4, PageID 806. In keeping with this promise, between 1984 and 2000, Jay executed at least 248 "popular songwriters agreement[s]." *Id.* As a result, Jay assigned his copyright interests in at least 248 songs to Jay Livingston Music. Each popular songwriters agreement had the same terms.

For example, on July 15, 1984, Jay executed a popular songwriters agreement for the hit song "Que Sera, Sera." Under the agreement, Jay Livingston Music would possess Jay's interest in that song's copyright for 28 years from the date the copyright's original term expired.

Because the original term of the copyright for "Que Sera, Sera" expired on December 31, 1983, Jay Livingston Music, per the terms of the agreement, would own Jay's interest in it from July 15, 1984 (the day Jay assigned it) to December 31, 2011 (28 years from the date of the copyright's original expiration). (It bears mentioning that, according to Tammy, Jay had renewed the copyright for "Que Sera, Sera" for the statutory maximum term of 67 years shortly before he assigned it to Travilyn in 1984. *See* 17 U.S.C. § 304.)

The popular songwriters agreements had other important terms. Jay, for example, held a reversionary interest in the copyright, meaning that it would "re-vest in Jay" once the company's interest expired in 2011. R. 46, PageID 878. For the time Jay Livingston Music owned the copyright, it would keep a portion of its royalties and pay the rest to Jay himself.

*The Family Trust*. On August 28, 1985, Jay and his wife established a trust called the Family Trust, transferring to it "all right, title and interest" in "their assets, whether real or personal." R. 39-1, PageID 714. At least two specific copyright interests in the broader bundle of assets transferred to the Family Trust deserve mention. One, the Family Trust received Jay's right to receive royalties under each of the popular songwriters agreements. As beneficiaries of the Family Trust, Travilyn, Tammy, and other members of the Livingston family have long received a percentage of these royalties. Two, as Tammy alleges in her complaint, the Family Trust also held Jay's reversionary interest in each of the copyrights he assigned to Jay Livingston Music. That meant that once the popular songwriters agreements held by Jay Livingston Music expired—2011 for "Que Sera, Sera," for example—Jay's interests in the underlying copyrights would revert to the Family Trust.

*Jay Livingston Music, Inc.* In March 2000, Jay Livingston Music, Inc. was established. Owned by Travilyn and her husband, Jay Livingston Music, Inc. is the legal successor to Jay Livingston Music, meaning that it possesses all the rights and interests held by Jay Livingston Music.

*The May 2000 Agreement*. On May 18, 2000, Jay agreed with Jay Livingston Music, Inc. to extend the time period that Jay Livingston Music (and thus Jay Livingston Music, Inc.) would possess his copyright interests. Specifically, he amended "each and every" popular songwriters

agreement "to replace the fixed term of years as set forth in each . . . with a term equal to the entire term of [the] copyright, including all renewals and extensions." R. 39-5, PageID 821. In effect, then, under the May 2000 Agreement, Jay Livingston Music, Inc. would own Jay's copyright interests, not for 28 years from the date of the copyrights' original expirations, but for the copyrights' entire terms. (Tammy alleges in her complaint that this latter period amounted to "another 50 years" from the time Jay signed the May 2000 Agreement, suggesting Jay Livingston Music, Inc. would possess Jay's copyrights until around 2050. R. 46, PageID 881.)

*Jay's death.* Jay died on October 17, 2001. His death sparked debate over what copyright interests, if any, the Family Trust continued to hold. A copyright lawyer retained by Jay's estate "gave the opinion that all of Jay's copyrights . . . had been effectively sold [to Jay Livingston Music, Inc.] and that nothing remained [in the Family Trust] other than the songwriter royalties." R. 24-2, PageID 465–66. In other words, the May 2000 Agreement accomplished what it sought to accomplish—Jay Livingston Music, Inc. would own Jay's interests in the assigned copyrights until their terms expired. But, of course, in keeping with the popular songwriters agreements, Jay Livingston Music, Inc. would continue to pay the Family Trust royalties for each assigned song.

With this opinion in hand, Travilyn proceeded to make a claim against the Family Trust, asserting that "*all* copyright interests in every song ever owned by Jay" had been "transferred" to "Jay Livingston Music, Inc." R. 24-1, PageID 455 (emphasis added). Gary Kress, trustee of the Family Trust, agreed with Travilyn. So he filed a petition in California probate court seeking an order that the Family Trust held "no interest in property claimed by another." R. 39-3, PageID 776 (citation modified). Kress's petition made clear that the Family Trust did "not dispute [Travilyn's] claim and request[ed] an Order of the Court that the FAMILY TRUST holds . . . no copyright interests, and that all such interests ever owned by JAY . . . are now owned by Jay Livingston Music, Inc." *Id.* at 793. The probate court later approved Kress's petition, entering an order stating: "The FAMILY TRUST holds . . . no copyright interests and all such interests ever owned by JAY . . . are now owned by Jay Livingston Music, Inc." R. 28-1, PageID 490. Attorneys for both Travilyn and Tammy signed the court's order, acknowledging that their respective clients "APPROVED" its content. R. 28-1, PageID 490.

*May 2015 terminations*. To understand further copyright-related developments in 2015, consider first the relevant statutory background. Federal copyright law allows a songwriter (or his statutory successor) to terminate the songwriter's "grant" (i.e., assignment) of a copyright to another party. 17 U.S.C. § 203(a). The termination right, we have explained, "allows an author [or his successor] to undo a prior transfer of his copyright and recapture all interests in the copyright for himself." *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 928 (6th Cir. 2016). If the author transferred his copyright to a third party in 1978 or later, he (or his successor) can terminate the transfer between 35 and 40 years after the copyright was assigned. 17 U.S.C. § 203(a)(3). Exercising that right requires the author (or his successor) to send a termination notice to the grantee and file the notice with the U.S. Copyright Office. *Id.* § 203(a)(4). "Upon the effective date of termination," the statute explains, "all rights" under federal copyright law "that were covered by the terminated grants revert to the . . . persons owning termination interests." *Id.* § 203(b).

With Jay and his wife deceased, Travilyn, as Jay's only child, possessed Jay's termination right. *Id.* § 203(a)(2)(B) (explaining that an "author's surviving children" "own the author's entire termination interest" if there is no "widow"). Seeking to exercise that power, Travilyn, in May 2015, served a termination notice for the song "Que Sera, Sera" on Jay Livingston Music, Inc., the grantee of the copyright's assignment. The termination purported to undo the 1984 popular songwriters agreement through which Jay had granted Jay Livingston Music (now, Jay Livingston Music, Inc.) his interests in "Que Sera, Sera." The notice stated that the grant's "effective date of termination" was July 15, 2019, with all rights under the "Que Sera, Sera" popular songwriters agreement then immediately reverting to Travilyn. *See* 17 U.S.C. § 203(a)(3). After serving the notice on her company, Travilyn recorded it with the U.S. Copyright Office. She proceeded to serve termination notices for 31 other copyright grants on her company.

*Federal court litigation*. In July 2022, Tammy sued her mother Travilyn in federal court, seeking a declaration that the termination notices Travilyn filed with the U.S. Copyright Office were ineffective, defective, or invalid. If the district court found the notices were effective, Tammy sought an alternative declaration that she continues to have a state law right to receive

royalties produced by the songs covered in the notices.  The district court dismissed Tammy's complaint under Civil Rule 12(b)(6), holding that it failed to state a claim.  Tammy timely appealed.

## II.

Fresh review applies to the district court's decision to dismiss Tammy's complaint under Civil Rule 12(b)(6).  *Mitchell v. McNeil*, 487 F.3d 374, 376 (6th Cir. 2007).  Accepting all well-pleaded factual allegations as true, we ask whether Tammy's complaint alleges sufficient facts to support a plausible theory of relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 669, 678 (2009).  Tested by that familiar standard, both of Tammy's requests for declaratory relief fail.

A. Tammy offers five reasons why she has adequately alleged that Travilyn's termination notices were ineffective, defective, or invalid.  Not one does the job.

1. Tammy first argues that Travilyn's 2015 termination notices were ineffective because, at the time they were issued, no active copyright assignments existed for Travilyn to terminate.  Section 203(a) allows a songwriter's statutory successor to terminate the songwriter's "grant" (in other words, the assignment) of a copyright to another party.  17 U.S.C. § 203(a).  The termination right, however, presupposes the existence of a copyright grant to be terminated.  And Tammy says no such grants existed.  To her mind, Travilyn's termination notices covered popular songwriters agreements (i.e., copyright grants) that had already expired.

Here, Tammy trains her sights on the legal effect of the May 2000 Agreement.  She claims that the agreement failed to validly extend the popular songwriters agreements beyond their 28-year terms because Jay signed the agreement as an "individual."  Only Jay as a "trustee," Tammy asserts, could have extended the popular songwriters agreements beyond their original terms, given that the Family Trust held Jay's reversionary interest in the copyrights at that time.  That means that when the agreements expired—around 2011, according to Tammy—Jay's interests in the underlying copyrights reverted to the Family Trust.  At that point, Tammy concludes, Travilyn no longer had any copyright grants to terminate, with the Family Trust instead owning the copyright interests underlying those grants.

In resolving Tammy's argument, however, we do not write on a clean slate. Rather, we must consider the preclusive effect of the 2003 California probate court order, which held that the Family Trust owned no interests in Jay's copyrights. As a federal court, we respectfully give state court judgments the same preclusive effect they would receive under state law. 28 U.S.C. § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Here, we thus look to California law to identify the effect, if any, that the California probate judgment has on Tammy's federal copyright suit.

Like most States, California follows the well-known doctrine of claim preclusion. As that doctrine is formulated in the Golden State, it prevents parties from litigating "matters which were raised or could have been raised" in an earlier suit. *Busick v. Workmen's Comp. Appeals Bd.*, 500 P.2d 1386, 1392 (Cal. 1972) (citation omitted). A claim preclusion inquiry prompts three questions: (1) Whether there was final judgment on the merits in a prior action, (2) whether the subsequent action is between the same parties, and (3) whether the claim asserted in the second action is identical to a claim raised in the first action, or could have been raised in the first action. *Boeken v. Philip Morris USA, Inc.*, 230 P.3d 342, 348 (Cal. 2010); *Thompson v. Ioane*, 218 Cal. Rptr. 3d 501, 509 (Cal. Ct. App. 2017). Because we answer "yes" across the board, we must give preclusive effect to the California probate court order.

First, the 2003 California probate order qualifies as a final judgment on the merits. The probate court had jurisdiction to enforce Kress's petition because it concerned the "internal affairs of a trust" administered in California. R. 24-1, PageID 438; *see also Harnedy v. Whitty*, 2 Cal. Rptr. 3d 798, 807 (Cal. Ct. App. 2003); Cal. Prob. Code § 17000 (West 2025). The court issued a final judgment, which ordered that Jay Livingston Music, Inc. owned all of Jay's interests in the copyrights at issue because of the May 2000 Agreement. And California courts have long treated probate orders as final judgments on the merits for preclusion purposes. *See Horan v. Roan (In re Est. of Redfield)*, 124 Cal. Rptr. 3d 402, 408 (Cal. Ct. App. 2011).

Second, today's action and the California probate case involve the same parties. Travilyn (a claimant against the Family Trust) and Tammy (a beneficiary of the Family Trust) were parties to the California litigation. In fact, each of them (via their counsel) signed the probate court's order, signaling that they "APPROVED" its "CONTENT." R. 28-1, PageID 490.

Third, Tammy's federal court action involves a claim that, at the very least, could have been raised in the earlier probate case. *Kim v. Reins Int'l Cal., Inc.*, 459 P.3d 1123, 1135 (Cal. 2020). For preclusion purposes, California courts define "claim" by identifying the "primary right" decided in the first case and asserted in the subsequent one. *Boeken*, 230 P.3d at 348–49. The term "primary right," in turn, is defined as the specific "harm" that the plaintiff has claimed to have "suffered." *Id.* In her copyright lawsuit, Tammy contends that, because Jay failed to validly extend the popular songwriters agreements when he signed the May 2000 Agreement, the Family Trust owns Jay's interests in the underlying copyrights in full. The specific "harm" that Tammy purportedly has "suffered," in other words, is that the Family Trust, of which she is a beneficiary, has been deprived of its rightful ownership of the copyrights. Yet that "claim" is "identical" to the one decided in the 2003 California probate order. That order, again, declared that the Family Trust held no ownership interests in copyrights to Jay's compositions and that Jay Livingston Music, Inc. owned the copyrights through the popular songwriters agreements. R. 28-1, PageID 490. All of this means that—contrary to Tammy's assertion—the Family Trust did not hold the copyright interests in Jay's songs at the time Travilyn filed her termination notices. Those interests were held by Jay Livingston Music, Inc. through the popular songwriters agreements. So there existed active popular songwriters agreements for Travilyn to terminate in 2015.

2. Tammy next claims that, even if the Family Trust did not own the copyright interests at issue, Travilyn nonetheless filed invalid termination notices in 2015 because the copyright grants they covered were not executed in accordance with federal copyright law. To understand the point, turn to § 203(a) of the Copyright Act, which authorizes an author (or his statutory successor) to terminate an author's copyright grant if, but only if, the grant had been "executed by the author." 17 U.S.C. § 203(a). According to Tammy, because Jay signed the May 2000 Agreement as a "trustee," he never "executed" any copyright "grant" as an "author," rendering the termination notices Travilyn filed ineffective. Appellant Br. 53. We can make quick work of this argument because, as already explained, Jay signed the May 2000 agreement as an individual. R. 39, PageID 829.

3. Tammy next claims that Travilyn filed an invalid termination notice for the specific copyright grant covering "Que Sera, Sera" because Jay never assigned his interests in that copyright to a third party. Section 203(a), the now-familiar termination provision, allows a songwriter's descendant to terminate the songwriter's "grant of a *transfer . . .* of any right under a copyright." 17 U.S.C. 203(a) (emphasis added). As Tammy reads the statute, the word "transfer" means that a songwriter's descendant may terminate only the songwriter's assignment of a copyright to *a third party*. That matters here, Tammy believes, because when Jay assigned the specific copyright for "Que Sera, Sera" to Jay Livingston Music on July 15, 1984, he really assigned it to himself, not a third party, as he owned Jay Livingston Music, a sole proprietorship.

Even if a songwriter's descendant cannot terminate a songwriter's assignment of a copyright to his own sole proprietorship—a point we need not decide—Tammy's argument still fails due to a flawed factual premise. Tammy presumes that Jay owned Jay Livingston Music when he assigned "Que Sera, Sera" to the company. Not so. The record shows that Travilyn owned Jay Livingston Music at that point. The 1984 Agreement in which Jay promised to assign his copyright interests to Jay Livingston Music stated that, as of "July 15, 1984," "TRAVILYN LIVINGSTON" was the "sole owner of the music publishing company" known as "'JAY LIVINGSTON MUSIC.'" R. 39-4, PageID 806.

Tammy responds that Travilyn failed to prove her ownership interest. But remember today's posture: evaluating Travilyn's motion-to-dismiss. At that stage, Tammy must allege facts that plausibly state a claim for relief. And as Tammy attached to her complaint the 1984 Agreement, which, again, shows that Travilyn owned Jay Livingston Music at the time Jay assigned the copyrights to the company, her argument depends on a factual premise her pleadings refute. *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (explaining that a court "may consider exhibits attached to the complaint").

4. Switching gears, Tammy contends that the district court committed reversible error when it observed that Travilyn became the owner of Jay Livingston Music "sometime before July 15, 1984," when, according to Tammy, the record supports only that Travilyn became the company's owner on (not before) July 15, 1984. *Livingston v. Jay Livingston Music, Inc.*, No. 22-cv-00532, 2024 WL 713780, at *1 (M.D. Tenn. Feb. 21, 2024). Even accepting Tammy's

clarification of the record, however, it still does not warrant reversal. Generally speaking, what matters more is not what the district court said, but what the district court did. We "review[] judgments," after all, "not statements in opinions." *Camreta v. Greene*, 563 U.S. 692, 704 (2011). And as the district court never relied on its assertion that Travilyn owned Jay Livingston Music before July 15, 1984 in issuing its judgment, there is no basis to remand.

5. In a final effort to convince the district court that Travilyn's termination notices were ineffective, Tammy argued that the notices violated copyright law. To understand Tammy's last argument, consider first some further aspects of federal copyright law. Federal law, remember, prescribes several requirements of a termination notice. *See* 17 U.S.C. § 203; *see also* 37 C.F.R. § 201.10(b)(2). Termination notices, for example, must "state the effective date of the [grant's] termination" (a date prescribed by law), and they must "comply" "in form" and "content" with "requirements that the Register of Copyrights shall prescribe by regulation." 17 U.S.C. § 203(a)(4)(A)-(B).

In her complaint, Tammy alleged that each of Travilyn's 32 termination notices violated the Register's prescribed requirements. R. 46, PageID 888–97. The notices, she claimed, did not reasonably identify the grants to which they applied, did not correctly identify the dates of publication, and did not contain a complete statement of the facts. *See* 37 C.F.R. § 201.10(b)(2)(iii), (b)(2)(v), (b)(3). The district court rejected these arguments as applied to the termination notice for "Que Sera, Sera"—a conclusion Tammy does not challenge here. *See Livingston*, 2024 WL 713780, at *6–8. Tammy instead argues that the district court committed reversible error when it held that she failed to plead specific factual allegations for the other 31 termination notices, especially the one for "Give It All You Got." *See* Appellant Br. 50.

The district court did not err. Look back at Tammy's complaint: Tammy, it is true, did broadly allege that all of Travilyn's termination notices failed to comply with federal requirements. But she otherwise focused exclusively on why the termination notice for "Que Sera, Sera" failed to comply with federal law; she made no specific factual allegations regarding the substance or content of any other termination notice. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that although a complaint need not have "detailed factual allegations," it must have "*enough*" well-pleaded factual allegations to support a plausible theory

of relief (emphasis added)).   Reflecting on this shortcoming, the district court held that the "notice-specific allegations raised for the first time in Tammy's [response brief to Travilyn's motion to dismiss] [could] not be considered." *Livingston*, 2024 WL 713780, at *7.   In other words, Tammy forfeited her arguments regarding the termination notices—including the one for "Give It All You Got"—for which she did not plead factual allegations in her complaint. *See id.* (holding that arguments regarding "Give It All You Got" were "dependent" on facts not alleged in the complaint, which "cannot win the day").   We see no basis for undermining that holding.   It is well understood that Tammy may not "cure [a pleading] deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 484 (6th Cir. 2020) (citation omitted).

In sum, Tammy has not plausibly alleged that Travilyn's termination notices were ineffective, defective, or invalid.   Accordingly, the district court properly dismissed her first declaratory judgment request.

B.   That leaves Tammy's second declaratory judgment request.   Tammy argues that, even if the termination notices were valid, that reality does not affect her state law right to receive royalties tied to the now-terminated popular songwriters agreements.   But Tammy has not identified a state law basis for this theory of relief.   She points us to neither a state law cause of action nor a specific state law right.   At best, she repeats that some unmentioned aspect of "state" law authorizes her to receive royalties produced by songs covered in the now-terminated agreements.   Because that barebones allegation does not satisfy Civil Rule 12(b)(6)'s pleading standards, Tammy's complaint fails to articulate a plausible claim for relief under state law. *Iqbal*, 556 U.S. at 679.

*       *       *       *       *

We affirm the district court's judgment.

———————————

## CONCURRENCE

———————————

CHAD A. READLER, Circuit Judge, concurring.  Neither party in this case addressed what cause of action underlies the declaratory relief Tammy asserted to invalidate Travilyn's termination notices.  As that question does not bear on our jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), the panel fairly left the issue aside, *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that parties, not courts, frame the issues for decision).  At the same time, it is not obvious how it would be answered.

All agree that Tammy sought a declaratory judgment announcing that Travilyn's termination notices were ineffective or invalid, consistent with the conditions set forth in § 203 of the Copyright Act.  When a plaintiff seeks to sue someone for violating federal law, she of course must assert a cause of action.  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  She can do so by showing that (1) her legal rights have been violated and (2) the law authorizes her to seek judicial relief.  *Id.*

What cause of action entitled Tammy to declare Travilyn's termination notices invalid?  Not the Declaratory Judgment Act, for starters.  That statute "does not create an independent cause of action." *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (citation omitted).  Instead, it serves the limited purpose of authorizing federal courts to declare the rights of a party in a case without granting any other traditional remedies such as damages or an injunction.  28 U.S.C. § 2201(a).  The "point" of the Declaratory Judgment Act, in other words, was to create a new "remedy for a preexisting right *enforceable* in federal court."  *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 902 (6th Cir. 2014) (emphasis added).  The availability of declaratory relief thus presupposes "the existence of a judicially remediable right."  *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *see, e.g.*, *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) (per curiam) ("The Declaratory Judgment Act does not provide a cause of action when a party . . . lacks a cause of action under a separate statute and seeks to use the Act to obtain affirmative relief."); *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (explaining that a group of plaintiffs "have not alleged a cognizable cause of action and therefore have no basis upon

which to seek declaratory relief" because the Declaratory Judgment Act does not "provide a cause of action"). In short, when a plaintiff sues someone for violating federal law and seeks a declaratory judgment, the plaintiff's "underlying cause of action" is the thing "actually" being "litigated." *Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990).

In search of that underlying cause of action, could the Copyright Act fit the bill? Looking first to § 203, the termination provision at issue, the statute allows an author (or his statutory successor) to terminate a prior transfer of his copyright and recapture all interests in the copyright for himself. 17 U.S.C. § 203. To terminate a copyright grant, the author (or his successor) must send a termination notice to the copyright grantee and file the notice with the U.S. Copyright Office. *Id.* § 203(a)(4). Nothing in § 203, however, expressly authorizes a party to bring an action in court to enforce its substantive provisions. The Ninth Circuit appears to agree. *See Ray Charles Found. v. Robinson*, 795 F.3d 1109 (9th Cir. 2015). In *Ray Charles Foundation*, plaintiff Ray Charles Foundation, a nonprofit corporation, sought a declaration under § 203 of the Copyright Act that termination notices filed by Ray Charles's heirs were invalid. *Id.* at 1115. In resolving the issue, the Ninth Circuit observed that "[t]he Copyright Act does not expressly provide for a private right of action under § 203." *Id.* at 1122. Returning to today's case, in the absence of an express cause of action related to the termination rights, Tammy's suit would appear to stumble from the start.

Could § 203 create an implied right of action? I am skeptical that it does. And skepticism is warranted. Implied causes of action are a creature of "the *ancien regime*," when federal courts asserted a freewheeling power to create remedies whenever they thought it necessary to "make effective" a congressional statute. *Sandoval*, 532 U.S. at 287. Today, however, implied causes of action are, to put it mildly, the exception, not the rule. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 132–33 (2017) (cautioning that when Congress intends to create a cause of action, it usually confers such an action "in explicit terms"); *Ohlendorf v. United Food & Com. Workers Int'l Union, Loc. 876*, 883 F.3d 636, 640 (6th Cir. 2018) (explaining that an implied right of action is a "rare creature"); *Snyder-Hill v. Ohio State Univ.*, 54 F.4th 963, 979 (6th Cir. 2022) (Readler, J., dissenting from the denial of rehearing en banc) ("The Supreme Court has

repeatedly rejected calls to provide . . . independent causes of action for violations of statutes without express remedies or the clear and unambiguous implication of a remedy."). That is, we recognize such an implied right of action only if the statute displays actual congressional intent "to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. To make this determination, we examine the "text and structure" of the statute at issue. *Id.* at 288. We may find an implied statutory right of action only if the congressional intent on this front is "clear and unambiguous" from the statute's text. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). Today, few if any statutes clear that high bar. *Cf. Medina v. Planned Parenthood S. Atl.*, --- S. Ct. ----, 2025 WL 1758505, at *7 (June 26, 2025) (observing in a related context that "it is rare enough for any statute to confer an enforceable right").

The Ninth Circuit, I note, found "an implied private cause of action" in § 203's "termination provisions" because those "provisions" create federal rights and "can be enforced by private action." *Ray Charles Found.*, 795 F.3d at 1122. In reaching that conclusion, the Ninth Circuit grounded its analysis in a federal regulation promulgated under the Copyright Act. The highlighted regulation, however, states only that the Copyright Office's recording of a termination notice "is not a determination by the Office of the notice's validity or legal effect." 37 C.F.R. § 201.10(f)(4) (2024). The regulation adds that "[r]ecordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal or formal requirements for effectuating termination . . . have not been met, including before a court of competent jurisdiction." *Id.*

I do not share the Ninth Circuit's assessment. Section § 203 may reflect an intent to create a *private right*, at least for an author or his statutory successors seeking to terminate the author's copyright grants. 17 U.S.C. § 203; *see also Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 928 (6th Cir. 2016) (explaining that § 203 "created a 'termination right'" belonging to an author and his statutory successors). But it seems doubtful that the provision or its implementing regulation manifests an intent to create a *private remedy*. Nothing in § 203 itself suggests that Congress intended private litigants to enforce the termination provisions in standalone declaratory judgment actions. And a regulation is a poor place from which to divine such a remedy. After all, "[l]anguage in a regulation may invoke a private right of action that

Congress through statutory text created, but it may not create a right that Congress has not." *Sandoval*, 532 U.S. at 291 (citation omitted). Nor, in any event, does the regulation speak in such capacious terms. It is not at all obvious that an instruction that federal courts draw no conclusion from the fact the Copyright Office recorded a termination notice in effect implies a cause of action to challenge that termination.

That said, a plaintiff may have other means available for pursuing a private right of action to enforce the termination provisions. Federal copyright law, for example, supplies a cause of action for infringement. *See* 17 U.S.C. § 501(b). Consider the following: A assigns B his copyright, and A later dies. A's son terminates A's assignment to B, but B continues to license the copyright, believing that A's son's termination notice was invalid. To remedy his purported injury, A likely could bring a copyright infringement action under § 501(b) against B; B could also invoke that provision to seek a declaration that he is not infringing A's son's copyright because A's son did not properly terminate the grant at issue. Each type of suit would allow A's son and B to dispute whether the requirements of the termination notice have been met. *E.g.*, *Smith v. Casey*, 741 F.3d 1236, 1240 (11th Cir. 2014) (analyzing the validity of a termination notice within a copyright infringement action). This reality, I note, bears back on the question raised here at the outset, as the fact that a plaintiff can use copyright infringement actions to enforce the termination provisions arguably indicates that the termination provisions themselves do not create a cause of action. "The express provision of one method of enforcing a substantive rule," remember, "suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290 (citation omitted).

Especially as no party briefed the issue, there is likely more to say on the matter. For instance, a non-preempted state common law right of action may be another way to enforce a party's termination rights. And perhaps there is more than meets the eye as to remedies in the language of § 203. For these reasons, it bears emphasizing that these thoughts are just that— thoughts. A future panel may pick up on them in a yet-to-come case.